**Exhibit A**

# STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (the "Agreement") is made as of September 20, 2000 among Cedar USA Holdings, Inc., a Delaware corporation (the "Buyer"), Cedar Group Plc, a corporation organized under the laws of the United Kingdom ("Parent") and Renaissance Worldwide, Inc., a Massachusetts corporation and the holder of all of the outstanding capital stock of the Company (as defined below) and the indirect holder of all of the outstanding capital stock of IndiaCo (as defined below) (the "Seller").

WHEREAS, the Seller owns all of the outstanding shares (the "Hunter Shares") of capital stock of The Hunter Group, Inc., a Maryland corporation (the "Company");

WHEREAS, the Seller owns all of the outstanding shares of Renaissance Worldwide IT Consulting Services, Inc., a Delaware corporation, which owns all of the outstanding shares of Renaissance Worldwide International Holdings, Inc., a Delaware corporation ("HoldCo") which owns 12,639 of the 12,641 outstanding shares (such 12,639 shares being the "IndiaCo Shares" and, together with the Hunter Shares, the "Shares") of capital stock of Renaissance Worldwide Consulting Private Limited, an India corporation ("IndiaCo");

WHEREAS, Parent controls all of the outstanding shares of the Buyer; and

WHEREAS, this Agreement contemplates a transaction in which the Buyer will purchase from the Seller and HoldCo, and the Seller will sell, or cause to be sold, to the Buyer, all of the Shares in exchange for the Purchase Price (as defined below).

NOW, THEREFORE, in consideration of these premises, the respective covenants of the Buyer, the Parent and the Seller set forth below and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. PURCHASE AND SALE OF THE SHARES.

    1.1.    The Shares.  Subject to compliance with all the terms and conditions of this Agreement and in reliance on the representations and warranties set forth in this Agreement, the Seller agrees to sell, or cause to be sold, to the Buyer, and the Buyer agrees to purchase from the Seller, at the Closing (as defined below) all of the Shares for the Purchase Price.

    1.2.    Consideration.  The consideration to be paid by the Buyer to the Seller for the Shares shall be cash in an aggregate amount equal to $72,000,000 (the "Purchase Price"), of which $71,424,000 shall be paid in respect of the Hunter Shares and $576,000 shall be paid in respect of the IndiaCo Shares.

    1.3.    The Closing.  The closing (the "Closing") shall be held at the offices of Ropes &

8321720

Gray, One International Place, Boston, Massachusetts, at 10:00 a.m. on October 16, 2000, or on such other date which the parties select, in either case as promptly as practicable (and in any event within two business days) after satisfaction or waiver of the conditions set forth in Sections 5, 6 and 7, (the date on which the Closing occurs being referred to herein as the "Closing Date"). At the Closing: (a) the Seller will deliver, or cause to be delivered, to the Buyer stock certificates representing all of the Hunter Shares and the IndiaCo Shares held by HoldCo together with separate stock powers duly executed in blank; (b) the Seller will deliver, or cause to be delivered, to the Buyer stock certificates representing all of the shares of IndiaCo not owned by HoldCo and of each subsidiary of the Company to the extent that such shares are certificated and are not owned by a Transferred Company immediately prior to the Closing, together with stock powers executed in blank; (c) the Buyer will deliver to the Seller the Purchase Price by wire transfer of immediately available funds to an account specified by the Seller at least two business days prior to the Closing; and (d) each party will deliver to the other such certificates, opinions and other documents as are contemplated hereby.

2.    REPRESENTATIONS AND WARRANTIES OF SELLER.

The Seller hereby represents and warrants to Buyer that, except as set forth in the written disclosure schedule delivered on or prior to the date hereof by the Seller to Buyer that is arranged in paragraphs corresponding to the numbered and lettered paragraphs contained in this Section 2 (the "Disclosure Schedule"):

2.1.    Organization and Qualification; Subsidiaries. Each of the Transferred Companies and the Seller is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has the requisite corporate power and authority necessary to own, lease and operate its properties and to carry on its business as it is now being conducted, except where the failure to be so organized, existing and in good standing or to have such power and authority would not reasonably be expected to have a Material Adverse Effect. Each of the Transferred Companies is duly qualified or licensed as a foreign corporation to do business, and is in good standing, in each jurisdiction where the character of its properties owned, leased or operated by it or the nature of its activities makes such qualification or licensing necessary, except for such failures to be so duly qualified or licensed and in good standing that would not reasonably be expected to have a Material Adverse Effect. A true and complete list of all of the Company's subsidiaries, together with the jurisdiction of incorporation of each subsidiary, the authorized capitalization of each subsidiary, and the percentage of each subsidiary's outstanding capital stock owned by the Company or another subsidiary, is set forth in Section 2.1 of the Disclosure Schedule. IndiaCo has no subsidiaries. Except for the subsidiaries described above in this Section 2.1, neither the Company nor any other Transferred Company directly or indirectly owns any equity or similar interest in, or any interest convertible into or exchangeable or exercisable for, any equity or similar interest in, any corporation, partnership, joint venture or other business association or entity.

2.2.    Charter Documents. The Seller has heretofore furnished to Buyer a complete and correct copy of the Company's Charter (including both Articles of Incorporation and By-Laws)

and has furnished to Buyer the Charter of IndiaCo and each of the other Transferred Companies. Such Charters are in full force and effect and no Transferred Company is in violation of any of the provisions of its Charter, except where the failure to be in full force and effect or where such violation has not had and would not reasonably be expected to have a Material Adverse Effect. No Shareholder or director resolutions exist which are contrary to the Charter of any Transferred Company as furnished to the Buyer or as reflected in the applicable governmental public records office. As of the date hereof, no resolution of any Transferred Company has been adopted to amend any Charter of any Transferred Company.

2.3.    Capitalization. The authorized capital stock of the Company consists of 3,000 shares of common stock, no par value, of which, 1,000 shares of common stock of the Company are issued and outstanding, all of which are validly issued, fully paid and nonassessable. The authorized capital stock of IndiaCo consists of 2,000,000 shares of common stock, Rs. 10 par value, of which, 12,641 shares of common stock of IndiaCo are issued and outstanding, all of which are validly issued, fully paid and non-assessable. Other than as contemplated by this Agreement, there are no outstanding options, warrants or other rights, agreements, arrangements or commitments of any character existing obligating the Seller or any Transferred Company to issue, sell or otherwise cause to become outstanding any shares of capital stock of, or other equity interests in, any Transferred Company. There are no obligations, contingent or otherwise, of any Transferred Company to repurchase, redeem or otherwise acquire any shares of common stock or the capital stock of any subsidiary or to provide funds to or make any investment (in the form of a loan, capital contribution, guaranty or otherwise) in any such subsidiary or any other entity. There are no voting trusts, proxies, or other agreements with respect to the voting of any capital stock of any Transferred Company. All of the outstanding shares of capital stock of each of the Company's subsidiaries are duly authorized, validly issued, fully paid and nonassessable.

2.4.    Authority Relative to this Agreement. The Seller has all necessary corporate power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement by the Seller and the consummation by the Seller of the transactions contemplated hereby have been duly and validly authorized by all necessary corporate action on the part of the Seller. This Agreement has been duly and validly executed and delivered by the Seller, and assuming the due authorization, execution and delivery by Buyer and Parent, constitutes a legal, valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms.

2.5.    Title to Shares. The Seller is the sole record and beneficial owner of, and has good and marketable title to, the Hunter Shares free and clear of any Lien, except for restrictions on transfer imposed by applicable securities laws. HoldCo is the sole record and individual owner of, and has good and marketable title to, the IndiaCo Shares free and clear of any Lien, except for restrictions on transfer imposed by applicable securities laws. The Company or another Transferred Company is the sole record and beneficial owner of, and has good and marketable title to, the outstanding Shares of each of the Company's subsidiaries free and clear of any Lien, except for restrictions on transfer imposed by applicable securities laws.

2.6.    No Conflict; Required Filings and Consents.

(a)    The execution and delivery of this Agreement by the Seller does not, and the performance of this Agreement by the Seller and the consummation of the transactions contemplated hereby will not, (i) violate the Charter of the Seller, (ii) violate the Charter of any Transferred Company, (iii) violate any national, federal, foreign, state or provincial law, statute, constitution, rule, regulation, order, judgment or decree (collectively, "Laws") applicable to any Transferred Company or the Seller or by which any of the Transferred Companies' respective properties are bound or affected, or (iv) result in any breach of or constitute a default (or an event that with notice or lapse of time or both would become a default) under, or give to any Person any rights of termination, amendment, acceleration or cancellation of, or result in the creation of a Lien on any of the properties or assets of any Transferred Company pursuant to, any note, bond, mortgage, indenture, contract, agreement, lease, license, permit, franchise or other instrument or obligation to which any Transferred Company is a party or by which any Transferred Company or any of their respective properties is bound or affected, except as to clauses (ii), (iii) and (iv) above for any such violations, breaches, defaults, rights, alterations or other occurrences that would not reasonably be expected to have a Material Adverse Effect.

(b)    The execution and delivery of this Agreement by the Seller does not, and the performance of this Agreement by the Seller will not, require any consent, approval, authorization or permit of, or filing with or notification to, any federal, foreign, state or provincial governmental or regulatory authority to be obtained or made by the Seller or any Transferred Company except (i) for compliance with applicable disclosure requirements, if any, under the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder (the "Exchange Act"), and compliance with the pre-merger notification requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act") and (ii) where the failure to obtain such consents, approvals, authorizations or permits, or to make such filings or notifications, would be reasonably expected to have a Material Adverse Effect.

2.7.    Compliance with Law.  No Transferred Company is in default or violation of any Law applicable to any Transferred Company or by which any of their respective properties is bound or affected, except for any such defaults or violations which have not had and would not reasonably be expected to have a Material Adverse Effect.  All governmental or regulatory licenses and permits necessary in connection with the operations of each of the Transferred Companies are in full force and effect and there are no pending or, to the knowledge of the Seller, threatened proceedings for the suspension or cancellation of any of them or, to the knowledge of the Company and Seller, any basis therefor, except in each case where the failure to be in full force and effect or the suspension or cancellation have not had and would not reasonably be expected to have a Material Adverse Effect.

2.8.    <u>Financial Statements</u>.  The Seller has furnished the Parent with copies of the following financial statements of the Company:  (a) the audited consolidated balance sheets as of December 31, 1999 and the related statements of income, change in stockholders' equity and cash flow for the fiscal year for each of the Company and its subsidiaries and IndiaCo ended on such date; and (b) the audited consolidated balance sheet as of June 30, 2000 (the "<u>Most Recent Balance Sheet</u>") and the related statements of income, change in stockholders' equity and cash flow for each of the Company and its subsidiaries and IndiaCo for the six-month period ended on such date ((a) and (b) collectively, the "<u>Financial Statements</u>").  True and correct copies of the Financial Statements are attached hereto as <u>Exhibit A</u>.  The Financial Statements (i) present fairly in all material respects the financial position of the Company and its subsidiaries and IndiaCo and the results of operations of the Company and its subsidiaries and IndiaCo as of the respective dates thereof and for the periods covered thereby and (ii) were prepared in accordance with United States generally accepted accounting principles ("<u>GAAP</u>"), applied on a consistent basis throughout the periods covered thereby.

2.9.    <u>Absence of Certain Changes or Events</u>.  Since the date of the Most Recent Balance Sheet, each Transferred Company has conducted its business in the ordinary course and there has not occurred: (a) any Material Adverse Effect; (b) any amendments or changes in the Charter of any of the Transferred Companies; (c) any material change by any Transferred Company in its accounting methods, principles or practices, except as may be required by GAAP; (d) any sale or other disposition of, or any damage, destruction or loss (not covered by insurance) to,  property of the Transferred Companies  in excess of $500,000 in the aggregate except in the ordinary course of business; (e) any material increase in compensation payable by the Transferred Companies to any director or executive officer or to senior employees listed on Section 2.9 of the Disclosure Schedule of any of the Transferred Companies, (f) except as otherwise contemplated by Section 4.2, any dividend or payment distribution to shareholders of any Transferred Company, nor have any rights to a future dividend been committed, transferred or pledged to third parties; (g) any payment of, nor is any Transferred Company obliged to pay, any management charges to the Seller or any of its Affiliates; (h) any acquisition of or agreement to acquire a material asset for an amount which is materially higher than the asset's market value; (i) any making or incurring of capital expenditures exceeding in total $1,000,000; (j) the loss of, reduction in trade with, or substantial alteration in the terms of trade with, any significant customer or significant supplier of the Transferred Companies, taken as a whole, other than losses, reductions or alterations which have not had and are not reasonably expected to have a Material Adverse Effect; or (k) any agreement by any of the Transferred Companies to do any of the foregoing.

2.10.    <u>No Undisclosed Liabilities</u>.  Except as disclosed in the Financial Statements, no Transferred Company has any liabilities (absolute, accrued, contingent or otherwise), except: (a) liabilities set forth on or reflected in the Financial Statements (or in any notes thereto), (b) contractual and other liabilities incurred prior to the date of the Most Recent Balance Sheet and not required under GAAP to be reflected on the Most Recent Balance Sheet (or in the footnotes thereto), (c) liabilities incurred since the date of the Most Recent Balance Sheet in the ordinary course of business, (d) liabilities with respect to matters disclosed in this Agreement

(including matters disclosed in the Disclosure Schedule), (e) liabilities under, or incurred in connection with, this Agreement; provided, however, that none of the exceptions set out in clauses (a) through (e) of this section shall serve in any way to modify or limit any other representation or warranty currently set forth in Section 2 of this Agreement, and (f) liabilities which would not reasonably be expected to have a Material Adverse Effect.

2.11.   Absence of Litigation.  There are no claims, actions, suits, hearings, investigations, charges, complaints, demands, notices or similar proceedings pending or, to the knowledge of the Seller, threatened against any of the Transferred Companies, by or before any national, international, federal, foreign, state or provincial court, arbitrator or administrative, governmental or regulatory authority or body that would reasonably be expected to have a Material Adverse Effect.

2.12.   Employee Benefit Plans, Employment Agreements.

(a)      Section 2.12(a) of the Disclosure Schedule contains a list of all material Company Benefit Plans maintained, administered by or contributed to, by any Transferred Company or Seller for the benefit of any employees, officers or directors of any Transferred Company (such individuals being referred to in this Section 2.12 as "Employees") (all such plans being referred to herein as "Transferred Company Plans", and all such Transferred Company Plans that will continue to be maintained or administered by the Company after the Closing Date are referred to herein as "Assumed Plans").

(b)      No independent contractor or leased employee who provides or provided services to any Transferred Company participates in or currently receives benefits under any Transferred Company Plan.

(c)      All Assumed Plans are in compliance in all material respects with applicable Law (including, where applicable, the Code, the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and the Consolidated Omnibus Reconciliation Act of 1985, as amended ("COBRA")).  The Company has made available to Buyer true, complete and correct copies of (i) each Transferred Company Plan (or in the case of any unwritten plan, a description thereof), which is administered or maintained by any Transferred Company, (ii) the three most recent annual reports on Form 5500 filed with the Internal Revenue Service with respect to each Transferred Company Plan which is administered or maintained by any Transferred Company, and (iii) the most recent summary plan description for each Transferred Company Plan. There is no pending or, to the knowledge of the Seller and each Transferred Company, threatened lawsuit, material claim or other material controversy relating to any Transferred Company Plan, other than claims for benefits in the normal course, which could result in material liability with respect to any Transferred Company.

(d)    No Transferred Company nor any corporation, trust, partnership or other entity that would be considered as a single employer with a Transferred Company under Section 4001(b)(1) of ERISA or Sections 414(b), (c), (m), or (o) of the Code (each an "ERISA Affiliate") maintains, or within the preceding six years has maintained or contributed to an employee pension benefit plan (within the meaning of Section 3(2) of ERISA) subject to Title IV of ERISA, Section 412 of the Code or Section 302 of ERISA. No ERISA Affiliate has any obligation to contribute to (or any other liability with respect to) any "multi-employer plan," as defined in the Multi-employer Pension Plan Amendments Act of 1980, and no ERISA Affiliate has incurred or will incur, as a result of the transaction contemplated by this Agreement, any withdrawal liability or termination liability as a result of a complete or partial withdrawal from any multi-employer plan. No Transferred Company, officer of any Transferred Company or any of the Transferred Company Plans which are subject to ERISA, any trusts created thereunder or any trustee or administrator thereof, has engaged in a nonexempt "prohibited transaction" (as such term is defined in Section 406 of ERISA or Section 4975 of the Code) or any other breach of fiduciary responsibility that could subject any Transferred Company or any officer of any Transferred Company to any material tax or penalty on prohibited transactions imposed by such Section 4975 or to any material liability under Section 502(i) or 502(l) of ERISA.

(e)    With respect to any Transferred Company Plan that is an "employee welfare benefit plan" within the meaning of ERISA Section 3(1), (i) all Assumed Plans are unfunded and no such Assumed Plan is funded through a "welfare benefits fund" (as such term is defined in Section 419(e) of the Code), (ii) each Assumed Company Plan may be amended and terminated in accordance with its terms, (iii) and as of the Closing Date, each Transferred Company may without material liability, other than ordinary course liabilities with respect to administrative costs, contributions, premiums or actual or contingent benefit claims with respect to periods prior to the Closing Date, cease all contributions to, and withdraw all Employees from, participation in such Transferred Company Plans (other than Assumed Company Plans).

(f)    With respect to any Employee, no Transferred Company has an obligation to contribute to (or any other liability with respect to) any funded or unfunded plan or program which provides medical, health, life insurance (other than the Renaissance Death in Service Scheme with UNUM Limited for the benefit of Employees in the United Kingdom or as otherwise required by local law) or other welfare benefits for current or future retirees or current or future former Employees (including their dependents and spouses) except for limited continued medical benefit coverage for former Employees, their spouses and their other dependents required to be provided under COBRA.

(g)    With respect to any Transferred Company Plan and any other plan, agreement, policy or arrangement that would be a Transferred Company Plan but for the fact that it is maintained outside of the United States for the benefit of any Employee, officer or director of any Transferred Company (the "foreign plans"), each such plan has

been, and will continue to be through the Closing Date, administered in accordance with its terms and with the requirements prescribed by any and all Laws in all material respects. All foreign plans are listed in Section 2.12(a) of the Disclosure Schedule and copies of the plans and all other material documents relating thereto have been provided to Buyer. All required contributions to, and premium payments on account of each foreign plan required to be made as of the date of the Most Recent Balance Sheet have been made or accrued on the Most Recent Balance Sheet and all required contributions to, and premium payments on account of each foreign plan required to be made through the Closing Date, shall be made in accordance with the terms of such plan, before the Closing Date. There are no material unfunded liabilities under any foreign plan. There is no pending or, to the knowledge of the Seller or any Transferred Company, threatened lawsuit, material claim or other material controversy relating to any foreign plan, other than claims for benefits in the normal course.

(h)     There are no agreements between any Transferred Company and/or Seller and any professional employer organization, employee leasing organization or other employee contracting organization, pursuant to which leased employees or co-employees provide services to any Transferred Company.

(i)     Except as set forth in Sections 2.9 and 2.14 of the Disclosure Schedule, no Employee has received any payment, or is entitled to receive any payment, by reason of the consummation of the transaction contemplated by this Agreement, that could constitute an excess parachute payment under Section 280G of the Code.

2.13.   Labor Matters. (a) There are no claims or proceedings pending or, to the knowledge of Seller, threatened, between the Transferred Companies and any union or any of their respective employees, asserting that any Transferred Company has committed an unfair labor practice which claims or proceedings are currently having or would reasonably be expected to have a Material Adverse Effect, (b) the Seller has no knowledge of any strikes, slowdowns, work stoppages, lockouts, or threats thereof, by or with respect to any employees of any Transferred Company which have had or would reasonably be expected to have a Material Adverse Effect, (c) the Company is not subject to and, to the knowledge of the Seller, no other Transferred Company is subject to, any collective bargaining agreement and (d) to the knowledge of the Seller, no Transferred Company is subject to any labor organizational effort or any demand for collective bargaining by any union organization.

2.14.   Material Contracts. Section 2.14 of the Disclosure Schedule includes a list of all of the following contracts of the Transferred Companies:

(a)     Any and all employment or consulting agreements (other than the Transferred Company Plans), in each case which are likely to involve payments by or on behalf of the Transferred Companies in excess of $150,000 per year and each series of employment or consulting agreements (other than the Transferred Company Plans) which

is likely to involve payment by or on behalf of the Transferred Companies to the same Person in excess of $500,000 per year in the aggregate;

(b)     Any and all other employment or consulting agreements (other than the Transferred Company Plans) which are subject, upon consummation of the sale of the Shares, to acceleration of benefits having a cost to the Transferred Companies in excess of $150,000 with respect to any employee;

(c)     All obligations to sell or otherwise dispose of any assets having a fair market value in excess of $200,000 except sales of inventory in the ordinary course of business;

(d)     All obligations under which (i) any Transferred Company has any obligation for Indebtedness or (ii) any Person has any obligation constituting or giving rise to a guarantee of any Indebtedness of any Transferred Companies, in either case involving any Indebtedness or liability in excess of $250,000 individually;

(e)     All obligations entered into since January 1, 1998 pursuant to which any of the Transferred Companies incurred an obligation to pay any amounts in excess of $250,000, or $1,000,000 in the aggregate, in respect of indemnification obligations, purchase price adjustment or otherwise in connection with any (i) acquisition or disposition of assets constituting a business or securities representing a controlling interest in any Person, (ii) merger, consolidation or other business combination, or (iii) series or group of related transactions or events of a type specified in subclauses (i) through (ii);

(f)     All obligations pursuant to which a Transferred Company may be expected to perform services or deliver goods with a value in excess of $500,000 per year and which cannot be canceled by the Transferred Company within 60 days, except for customer purchase orders issued or received and subcontracts with respect to consulting services entered into in the Ordinary Course of Business;

(g)     All obligations pursuant to which a Transferred Company may be obligated to pay for goods and services to be delivered or performed in excess of $150,000 per year, except for purchase orders issued or received and subcontracts with respect to consulting services entered into in the ordinary course of business;

(h)     To the actual knowledge of the executive officers of the Seller, all strategic alliances or similar agreements; and

(i)     Any guaranty in writing securing another Person's (other than a Transferred Company) obligation in excess of $25,000.

Each of the contracts listed on Section 2.14 of the Disclosure Schedule shall be referred to herein collectively as the "Contracts"). Except as has not had and would not reasonably be expected to

8321720                                        -9-

have a Material Adverse Effect: (i) no Transferred Company has violated, is in default under, or has received written notice of any violation of or default under, any of the Contracts, (ii) to the knowledge of the Seller, no other party to any of the Contracts has violated or is in default of any of its obligations thereunder, and (iii) to the knowledge of the Seller, each of the Contracts is in full force and effect.

2.15. . Transactions with Affiliates. Neither the Seller nor any of its Affiliates (other than the Transferred Companies) is a party to any contract or other business arrangement with any of the Transferred Companies other than contracts entered into in the ordinary course of business and upon terms no less favorable to such Transferred Company than the terms that would result from arms-length negotiations between the parties thereto. All Contracts, or other business arrangements, between the Seller or any of its Affiliates (other than the Transferred Companies) and any Transferred Company, are listed on Section 2.15 of the Disclosure Schedule, other than Contracts or other business arrangements as have not had and would not reasonably be expected to have a Material Adverse Effect. Immediately after Closing, no Transferred Company will have any contractual or other arrangements of any sort with Seller or any of its Affiliates, except as provided under this Agreement or as described in Section 2.15 of the Disclosure Schedule.

2.16. Taxes.

(a)    For purposes of this Agreement, "Tax" or "Taxes" shall mean taxes and assessments payable to any federal, state, local or foreign taxing authority, including (i) income, franchise, profits, gross receipts, *ad valorem,* net worth, value added, sales, use, service, real or personal property, capital stock, license, payroll, withholding, employment, social security, workers' compensation, unemployment compensation, utility, severance, production, excise, stamp, occupation, premiums, windfall profits, transfer and gains taxes, and (ii) interest, penalties, additional taxes and additions to tax imposed with respect thereto; and "Tax Returns" shall mean returns, reports, declarations and information statements with respect to Taxes required to be filed with the Internal Revenue Service (the "IRS") or any other federal, foreign, state or provincial taxing authority, domestic or foreign, including, without limitation, consolidated, combined and unitary tax returns.

(b)    All Tax Returns required to be filed by, or which include, any Transferred Company (for such periods as such Transferred Company was owned directly or indirectly by the Seller) have been filed (giving effect to extensions), other than those Tax Returns as to which the failure to file would not reasonably be expected to have a Material Adverse Effect, and all material Taxes shown as due thereon have been paid.

(c)    There are no outstanding liens for Taxes (other than for current Taxes not yet due and payable) upon the assets of any Transferred Company which would reasonably be expected to have a Material Adverse Effect.

(d)    There is no outstanding dispute or claim concerning any Tax for which any Transferred Company could be liable which would reasonably be expected to have a Material Adverse Effect.

(e)    The Financial Statements contain adequate provision through the dates thereof for all unpaid Taxes of the Transferred Companies determined in accordance with generally accepted accounting principles.

(f)    None of the Transferred Companies has waived any Statute of Limitations in respect of Taxes or agreed to any extension of time with respect to tax assessment or deficiency.

2.17.    Environmental Matters.    Except in all cases as, in the aggregate, have not had and would not reasonably be expected to have a Material Adverse Effect, the Transferred Companies:  (i) have obtained all permits and approvals which are required to be obtained under all Laws or code, plan, notice or demand letter issued, entered, promulgated or approved thereunder relating to pollution or protection of the environment, including without limitation laws relating to emissions, discharges, releases or threatened releases of pollutants, contaminants or hazardous or toxic materials or wastes into soil, land surface or subsurface strata, real property, surface waters (including navigable waters, ocean waters, streams, ponds, drainage basins and wetlands), groundwater, water body sediments, drinking water supply, stream sediments, ambient air (including indoor air), plant and animal life (including fish and all other aquatic life) and any other environmental medium or natural resource or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport, or handling of pollutants, contaminants or hazardous or toxic materials or wastes by the Transferred Companies or their respective agents or to the conservation, management, development, control and/or use of land, natural resources and wildlife (collectively, "Environmental Laws"); (ii) have complied and are in compliance with all terms and conditions of such required permits and approvals, and also are in compliance with all other limitations, restrictions, conditions, standards, prohibitions, requirements, obligations, schedules and timetables contained in applicable Environmental Laws; (iii)  have not received notice of any past or present violations of Environmental Laws or any event, condition, circumstance, activity, practice, incident, action or plan which is reasonably likely to interfere with or prevent continued compliance with or which would give rise to any common law or statutory liability, or otherwise form the basis of any claim, action, suit or proceeding, against the Transferred Companies based on or resulting from the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling, or the emission, discharge or release into the environment, of any pollutant, contaminant or hazardous or toxic material or waste; and (iv) have taken all actions necessary under applicable Environmental Laws to register any products or materials required to be registered by the Transferred Companies (or any of their respective agents) thereunder.

2.18.    Intellectual Property.

(a)    The Transferred Companies, directly or indirectly, own, or are licensed or otherwise possess legally enforceable rights to use, all Intellectual Property that is used in and material to the business of the Transferred Companies, taken as a whole, as currently conducted (the "Intellectual Property Rights"), except where the failure to do so has not had and would not reasonably be expected to have a Material Adverse Effect. Except as set forth on Section 2.18(a) of the Disclosure Schedule, each Intellectual Property Right owned or used by any of the Transferred Companies immediately prior to the Closing will be owned or available for use by the Transferred Companies on substantially similar terms and conditions immediately after the Closing other than Intellectual Property Rights the loss of which would not be reasonably expected to have a Material Adverse Effect.

(b)    No claims have been asserted to the Transferred Companies in writing or, to the knowledge of the Seller, are threatened by any Person nor are there any valid grounds, to the knowledge of the Seller, for any bona fide claims (i) against the use by the Transferred Companies of the Intellectual Property Rights, including but not limited to claims alleging interference, infringement, or misappropriation of any Person's Intellectual Property Rights, or (ii) challenging the ownership by the Transferred Companies, or the validity or effectiveness of any of the Intellectual Property Rights, except for such claims that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Neither the Seller nor any Transferred Company is involved in any enforcement action with respect to any interference with, infringement upon or misappropriation of any Intellectual Property Right of any Transferred Company.

(c)  ·  Section 2.18(c) of the Disclosure Schedule identifies each item of Intellectual Property that is used in and material to the business of the Transferred Companies.

2.19.    Insurance. The Seller has delivered or made available to the Buyer true and accurate copies of all material policies or binders of insurance covering the operations of the Transferred Companies as in effect on the date hereof. To the knowledge of the Seller, the Seller and the Transferred Companies are not in material default with respect to their obligations under any of such policies.

2.20.    Brokers. No broker, finder or investment banker (other than SG Cowen Securities Corporation, the fees and expenses of whom will be paid by the Seller) is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Transferred Companies, the Seller or their Affiliates.

2.21.    Change in Control Payments. Neither the Transferred Companies nor the Seller have any plans, programs or agreements to which they are parties, or to which they are subject, pursuant to which payments by the Transferred Companies or acceleration of benefits to be paid

by the Transferred Companies, may be required upon consummation of the sale of all of the Shares.

2.22.    <u>Leasehold Property and Tangible Assets</u>.  The Transferred Companies have good title to, and a valid leasehold interest in, the properties and other tangible assets used by them, including but not limited to the buildings covered by the Leases as defined below, located on their premises, or reflected on the Most Recent Balance Sheet or acquired after the date thereof, free and clear of all Liens, except for assets disposed of in the ordinary course of business since the date of the Most Recent Balance Sheet.  To the extent that any Transferred Company is responsible for the maintenance of any building on the property covered by any Lease pursuant to the express terms of such Lease, to the knowledge of the Seller, such Transferred Company has used commercially reasonable efforts to comply with the maintenance obligations of such lease.

2.23.    <u>Real Property</u>.

(a)    The Transferred Companies do not own any real property.

(b)    Section 2.23(b) of the Disclosure Schedule lists all real property leased to or subleased to or otherwise occupied by the Transferred Companies and the leases or subleases or other occupancy arrangement relating to such real property entered in connection with such occupancy (the "Leases").  True, complete and correct copies of all of the Leases and all material amendments thereto (including but not limited to any other occupancy arrangements, if written documentation exists) , if any, have been made available or delivered to the Buyer.

(c)    There are no leases, subleases, licenses or other agreements granting to any party or parties the right of use or occupancy of any portion of any real property leased to any Transferred Company, except for leases, subleases, licenses or other agreements as have not had and would not reasonably be expected to have a Material Adverse Effect.

(d)    Except for the leases set forth on Section 2.23(d) of the Disclosure Schedule, none of the Transferred Companies has assigned any lease for real property which is in effect as of the date hereof under which it was the original lessee or in respect of which it entered into obligations that continued after an assignment by a Transferred Company without receiving an indemnity for its material obligations, if any, under such lease after such assignment.

(e)    The Transferred Companies have in their possession and under their control all of the Leases and all material amendments thereto (including but not limited to any other occupancy agreements, if written documentation exists) entered in connection with the occupancy and use of real property by any of the Transferred Companies and will retain such possession through the Closing.

2.24. <u>Agency Agreements</u>.

(a)    Summarized accurate details of all of any commission payments due to any agents under any of the disclosed agency arrangements are contained in Section 2.24 of the Disclosure Schedule, except for such arrangements as have not had and would not reasonably be expected to have a Material Adverse Effect.

(b)    To the extent that the same are applicable to any of the disclosed agency arrangements, each Transferred Company on the one hand and each agent on the other have complied with their respective obligations under Council Directive 86/653/EEC regarding self-employed commercial agents and/or any UK or other EU Member State legislation enacted to give effect to the same (including but not limited to the Commercial Agents (Council Directive) Regulations 1993), except as have not had and would not reasonably be expected to have a Material Adverse Effect.

2.25. <u>Insolvency</u>. No Transferred Company is subject to any insolvency proceedings of any nature in any part of the world. Without limiting the generality of the foregoing:

(a)    no receiver, trustee, administrator or administrative receiver or similar officer has been appointed of the whole or any part of the assets or undertakings of any Transferred Company;

(b)    no Transferred Company is in liquidation, is the subject of a voluntary arrangement or administration order or is in receivership, and no order, petition, application, proceeding, meeting, statutory demand or resolution has been made, presented, brought, called or passed for any of those purposes or for any similar procedure in any jurisdiction; and

(c)    no Transferred Company is insolvent, nor is it deemed unable to pay its debts, and there is no unfulfilled or unsatisfied judgment or court order outstanding against any Transferred Company and there has been no delay by any such Transferred Company in the payment of any obligation due for payment.

3.    REPRESENTATIONS AND WARRANTIES OF PARENT AND BUYER.

Each of Parent and Buyer hereby jointly and severally represents and warrants to the Seller that:

3.1. <u>Organization and Qualification</u>. Each of Buyer and Parent is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation.

3.2. <u>Authority Relative to this Agreement</u>. Each of Buyer and Parent has all necessary corporate power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the transactions contemplated hereby. The execution

8321720                                    -14-

and delivery of this Agreement by each of Buyer and Parent and the consummation by each of Buyer and Parent of the transactions contemplated hereby have been duly and validly authorized by all necessary corporate action on the part of each of Buyer and Parent, and no other corporate proceedings on the part of Buyer or Parent are necessary to authorize this Agreement or to consummate the transactions contemplated thereby. This Agreement has been duly and validly executed and delivered by each of Buyer and Parent and, assuming the due authorization, execution and delivery by the Seller, constitutes a legal, valid and binding obligation of each of Buyer and Parent enforceable against it in accordance with its terms.

    3.3.   <u>No Conflict, Required Filings and Consents.</u>

        (a)    The execution and delivery of this Agreement by each of Buyer and Parent does not, and the performance of this Agreement by each of Buyer and Parent will not, and the consummation of the transactions contemplated hereby will not, (i) conflict with or violate the Charter of either Buyer or Parent, (ii) conflict with or violate any Laws applicable to either Buyer or Parent or by which its properties are bound or affected, or (iii) result in any breach of or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give to any Person any rights of termination, amendment, acceleration or cancellation of, or result in the creation of a Lien on any of the properties or assets of either Buyer or Parent pursuant to, any note, bond, mortgage, indenture, contract, agreement, lease, license, permit, franchise or other instrument or obligation to which either Buyer or Parent is a party or by which either Buyer or Parent or their respective properties are bound or affected, except in any such case for any such conflicts, violations, breaches, defaults or other occurrences that would not reasonably be likely to materially delay or prevent the consummation of the transactions contemplated hereby.

        (b)    The execution and delivery of this Agreement by each of Buyer and Parent does not, and the performance of this Agreement by each of Buyer and Parent will not, require any consent, approval, authorization or permit of, or filing with or notification to, any federal, foreign, state or provincial governmental or regulatory authority to be obtained or made by either Buyer or Parent, except (i) for the pre-merger notification requirements of the HSR Act, and (ii) where the failure to obtain such consents, approvals, authorizations or permits, or to make such filings or notifications, would not reasonably be likely to materially delay or prevent the consummation of the transactions contemplated hereby.

    3.4.   <u>Financial Ability to Perform.</u>  Buyer has provided to Seller a true and correct copy of the Underwriting Agreement dated September 20, 2000 among Buyer, Parent and the other parties thereto (the "<u>Underwriting Agreement</u>"). The Underwriting Agreement has been duly executed and delivered by each party thereto and constitutes a legal, valid and binding obligation of each party thereto, enforceable against each party thereto in accordance with its terms. The Underwriting Agreement and consummation of the transactions contemplated thereby are not subject to any condition other than as set forth in the Underwriting Agreement. Neither Buyer

8321720

-15-

nor Parent is aware of any fact or occurrence that makes any of the assumptions or statements set forth in the Underwriting Agreement inaccurate or that would cause the Underwriting Agreement to be ineffective or that precludes the satisfaction of the conditions set forth in the Underwriting Agreement. At Closing, the Buyer will have cash funds sufficient as and when needed to pay the Purchase Price, to pay all fees and expenses of the Buyer incurred in connection with the transactions contemplated hereby and to provide adequate working capital to operate the Transferred Companies. Upon the consummation of the transactions contemplated hereby, the Parent, the Buyer and the Transferred Companies will not: (i) be insolvent or left with unreasonably small capital, (ii) have incurred debts beyond their ability to pay such debts as they mature, or (iii) have their capital impaired.

3.5.    Brokers. No broker, finder or investment banker (other than Merrill Lynch, whose fees and expenses will be paid solely by the Buyer) is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Parent or its Affiliates.

3.6.    Investment Intent. Buyer is acquiring the Shares for its own account and not with a view to their distribution within the meaning of Section 2(11) of the Securities Act.

3.7.    Financial Statements. The Parent has furnished the Seller with copies of the audited consolidated balance sheets and audited profit and loss accounts as of March 31, 2000 and the related statements of income, change in stockholders' equity and cash flow for the fiscal year for the Parent (the "Parent Financial Statements"). True and correct copies of the Parent Financial Statements are attached hereto as "Exhibit D". The Parent Financial Statements (i) present fairly in all material respects the financial position of the Parent and the results of operations of the Parent as of the date thereof and for the periods covered thereby and (ii) were prepared in accordance with United Kingdom generally accepted accounting principles, applied on a consistent basis throughout the periods covered thereby.

4.    COVENANTS OF THE PARTIES.

4.1.    Conduct of Business Prior to Closing. The Seller covenants and agrees that, during the period from the date of this Agreement and continuing until the earlier of the termination of this Agreement (pursuant to the terms hereof) or the Closing Date, unless Buyer shall otherwise agree and except as otherwise contemplated by this Agreement or the Disclosure Schedule, the Seller shall cause each of the Transferred Companies to (i) conduct its business and shall cause the businesses of its subsidiaries to be conducted in all material respects in the ordinary course of business and (ii) use reasonable commercial efforts to preserve substantially intact the business organization of the Transferred Companies taken as a whole, to keep available the services of the present key officers, employees and consultants of the Transferred Companies taken as a whole and to preserve the present relationships of the Transferred Companies with customers, suppliers, lessors, licensors and other persons with which any Transferred Company has significant business relations. By way of amplification and not limitation, except as contemplated by this Agreement or the Disclosure Schedule, no Transferred Company shall,

8321720

-16-

during the period from the date of this Agreement and continuing until the earlier of the termination of this Agreement (pursuant to the terms hereof) or the Closing Date, directly or indirectly do, or propose to do, any of the following without the prior consent of Buyer (a) increase the compensation (including bonuses) payable by any Transferred Company on or after the date hereof, or to become payable by any Transferred Company on or after the Closing, to any executive officer or director or senior employee listed on Section 2.9 of the Disclosure Schedule of such Transferred Company, other than de minimis increases in the ordinary course of business; (b) enter into or perform any transactions with Affiliates other than on an arms length basis and in the ordinary course of business; (c) declare, set aside or pay any dividends, issue, purchase or redeem any shares of its capital stock or any convertible securities into or exchangeable for any of its capital stock, or make any other distributions to its shareholders (except for cash distributions as contemplated by Section 4.2); (d) grant any options or other rights to purchase or obtain (including upon conversion, exchange or exercise) any of its capital stock; (e) incur, assume, or guaranty any liabilities or Indebtedness of any kind other than Indebtedness which is incurred in the ordinary course of business; (f) amend the Charter of any Transferred Company; or (g) dispose of any material assets, except for sales or dispositions of assets in the ordinary course of business.

    4.2.   <u>Cash and Debt Related Agreements.</u>

        (a)    The parties hereto agree that as of the close of business on September 30, 2000, Seller shall cause the Transferred Companies to terminate all arrangements by which cash is transferred from accounts of the Transferred Companies to the Seller and Seller will not allow the Transferred Companies to transfer cash to the Seller or any Affiliate of the Seller (other than the Transferred Companies) in any other manner; provided, however, that (i) the Transferred Companies may reimburse the Seller for goods or services provided in the ordinary course of business by the Seller or its Affiliates or (ii) to the extent that the Seller contributes cash to the Transferred Companies at any time after September 30, 2000 through the Closing Date to fund operating liabilities of the Transferred Companies (including, but not limited to, payroll), the Transferred Companies shall be permitted to transfer cash up to such amount (the "Renaissance Advance") to the Seller at any time prior to the Closing. If, at the Closing, Seller has not caused the Transferred Companies to transfer cash equal to the Renaissance Advance to the Seller, and the Transferred Companies are unable to transfer all or any portion of such amount immediately prior to Closing, Parent shall cause the Transferred Companies to pay the amount of such shortfall to Seller as soon as practicable after Closing, but in no event later than the later of (i) the Closing Date or (ii) the date on which the Draft Calculation is delivered.

        (b)    As of September 30, 2000 (i) except for the Indebtedness listed in Schedule 4.2(b), the Seller shall repay, or cause the Transferred Companies to repay, all Indebtedness owed by the Transferred Companies to Persons other than the Seller and its Affiliates; and (ii) the Seller shall cause to be canceled any Indebtedness owed by any of the Transferred Companies to the Seller or any of its Affiliates (other than the

8321720

-17-

Transferred Companies) or owed by the Seller or any of its Affiliates (other than the Transferred Companies) to the Transferred Companies to the extent not repaid at or prior to September 30, 2000.

(c)    The remainder of this Section 4.2 relates to a cash payment to Seller and working capital purchase price adjustment to be determined as provided herein (the "Adjustment"). Commencing on October 1, 2000, finance personnel of the Transferred Companies, under the supervision and direction of the Seller (or, after the Closing, the Parent), shall prepare a draft calculation (the "Draft Calculation") of the working capital of the Transferred Companies (on a consolidated basis) as of September 30, 2000 (the "September Working Capital"). The Draft Calculation shall be completed no later than October 20, 2000 and shall be delivered by the Seller to the Parent (if completed at or prior to the Closing) or by the Parent to the Seller (if completed after the Closing) upon completion. On the later of (i) the Closing Date and (ii) the date two business days after the date on which the Draft Calculation is delivered to the Buyer or Seller, as applicable, (the "September Cash Payment Date"), Parent shall pay to the Seller an amount equal to the "cash and cash equivalents" and the "short-term investments" contained in the Draft Calculation (collectively, the "September Cash") plus $1,100,000. It is understood that, because the September Working Capital is to be calculated as of September 30, 2000, the actions contemplated in Section 4.2(b) hereof will have occurred prior to such calculation. The term "working capital" as used in the second sentence of this Section 4.2(c) shall (i) mean and take into account only the accounting items specified on Schedule 4.2(c) hereto, (ii) not include cash except to the extent that the September Cash paid to the Seller by the Parent on the September Cash Payment Date differs from the total "cash and cash equivalents" and the "short-term investments" included in the PWC Calculation or the Final September Working Capital or Indebtedness to the extent it is paid, returned or canceled at or prior to the Closing as contemplated by this Section 4.2 and (iii) other than as specified in clause (i) of this sentence, be prepared in accordance with the following policies (in the order shown below) (the "Policies"):

(A)    the same accounting policies pursuant to which the Most Recent Balance Sheet was prepared;

(B)    to the extent not identified in paragraph (A) above, in accordance with GAAP.

Notwithstanding anything to the contrary contained in this Section 4.2, for purposes of calculating the September Working Capital, any amount paid by the Transferred Companies relating to, or any charge incurred in connection with, the payment of the "Deal Bonuses" described in Section 4.15 below on or prior to September 30, 2000 shall be added back into the calculation of the September Working Capital.

(d)    If the Parent and the Seller both accept the Draft Calculation, the Draft Calculation shall be deemed to be the final calculation of the September Working Capital.

At the request of either the Parent or the Seller, within five days of delivery of the Draft Calculation, the Parent and the Buyer shall jointly instruct PricewaterhouseCoopers LLC ("PWC") (subject to the provisions of typical hold harmless / indemnity agreements with independent accountants) to review the Draft Calculation and to prepare and deliver to the Parent and the Buyer, as soon as reasonably practicable but in any event within 21 days after PWC is so instructed, PWC's calculation of the September Working Capital, (i) calculated and taking into account only the accounting items of the type specified on Schedule 4.2(c) hereto, and (ii) other than as specified in clause (i) of this sentence, prepared in accordance with the Policies (the "PWC Calculation"). The parties hereto shall give PWC full and complete access to their working papers, books and records to the extent requested by PWC in order to conduct the PWC Calculation.

(e)     The Parent and the Seller shall each review the PWC Calculation upon its completion. The Parent and the Seller agree that the purpose of their review of the PWC Calculation is to satisfy themselves that the methodologies, standards and policies adopted in the preparation of the PWC Calculation followed the Policies and that there are no manifest or material errors. Unless the Parent or the Seller have notified the other in writing within 21 days of receipt of the PWC Calculation that it does not accept the PWC Calculation (giving with such notice full details of the reasons for non-acceptance) (the "Non-Acceptance Notice"), the Seller and the Parent shall be deemed to have agreed to the PWC Calculation, and in such case the PWC Calculation shall be deemed to be the final calculation of the September Working Capital.

(f)     If the Seller or the Parent gives a Non-Acceptance Notice within the permitted 21 day period, the Seller and the Parent shall cooperate in good faith for a period of 10 days from the date of the Non-Acceptance Notice, in working together (and with PWC) to attempt to resolve all reasons for such non-acceptance. If all such differences are not resolved by the end of such 10 day period, the matter shall be referred to, and the form and content of the final calculation of the September Working Capital shall be conclusively determined by KPMG (the "Independent Expert").

(g)     In the event that the September Working Capital, as finally calculated and determined in accordance with Sections (c) through (f) of this Section 4.2 (the "Final September Working Capital"), is less than $9,433,000 (the "Working Capital Deficit"), the Seller shall pay to the Buyer an amount equal to the Working Capital Deficit, plus interest as provided in Section 4.2(j); provided, however, that there shall be no such payment if the amount of the Working Capital Deficit is less than $50,000. If the Final September Working Capital is greater than $9,433,000 (the "Working Capital Surplus"), the Buyer or the Parent shall pay to the Seller an amount equal to the Working Capital Surplus, plus interest as provided in Section 4.2(j); provided, however, that there shall be no such payment if the amount of the Working Capital Surplus is less than $50,000.

(h)     Any payment required by Section 4.2(g) shall be made within 10 days after the completion of the determination of the Final September Working Capital, to an

account and as reasonably instructed by the party receiving such payment. Any such payment shall be deemed to be an adjustment to the Purchase Price and shall be allocated 99.2% to the purchase of the Hunter Shares and 0.8% to the purchase of the IndiaCo Shares.

(i)     Each party shall bear its own costs and expenses in connection with the provisions of this Section 4.2 relating to the Adjustment, except that the party which requests that PWC be consulted pursuant to Section 4.2(d) shall pay the fees and expenses of PWC in connection with services provided pursuant to Section 4.2(d) and the fees and expenses of the Independent Expert shall be allocated between the Parent and the Seller by the Independent Expert in proportion to the resolution of the dispute.

(j)     Any payment under Section 4.2(g) shall bear interest from the date of the Closing until such payment is made, with such interest to accrue at an annual rate equal to nine percent (9%).

4.3.    HSR Act. As promptly as practicable, and in any event within 10 business days after the date of the execution of this Agreement, the Seller and the Buyer shall, if necessary, file notifications under and in accordance with the HSR Act in connection with the transactions contemplated hereby, and respond as promptly as practicable to any inquiries received from the Federal Trade Commission and the Antitrust Division of the Department of Justice for additional information or documentation and respond as promptly as practicable to all inquiries and requests received from any State Attorney General or other federal, foreign, state, local or other governmental authority in connection with antitrust matters.

4.4.    Access to Information; Confidentiality. Upon reasonable notice and subject to restrictions contained in confidentiality agreements to which such party is subject, the Seller shall (and shall cause the Transferred Companies to) afford to the officers, employees, accountants, counsel and other representatives of the Parent, reasonable access, during the period prior to the Closing Date, to all of the Transferred Companies' properties, books, contracts, commitments and records and, during such period, the Seller shall (and shall cause the Transferred Companies to) furnish promptly to the Parent all information concerning the Transferred Companies' business, properties and personnel as the Buyer may reasonably request, and shall make available to the Parent the appropriate individuals (including attorneys, accountants and other professionals) for discussion of the Transferred Companies' business, properties and personnel as the Parent may reasonably request. Parent and Buyer shall keep such information confidential in accordance with the terms of the Mutual Confidentiality Agreement, dated June 14, 2000 (the "Confidentiality Letter"), between the Parent and the Seller.

4.5.    Consents; Approvals. The Parent, the Buyer and the Seller shall each use reasonable efforts to obtain all consents, waivers, approvals, authorizations or orders (including, without limitation, all United States and foreign governmental and regulatory rulings and approvals), and the Parent, the Buyer and the Seller shall make all filings (including, without limitation, all filings with United States and foreign governmental or regulatory agencies)