required in connection with the authorization, execution and delivery of this Agreement by the Parent, the Buyer and the Seller and the consummation by them of the transactions contemplated hereby, in each case as promptly as practicable. The Parent, the Buyer and the Seller shall furnish promptly all information required for any application or other filing to be made pursuant to the rules and regulations of any United States or foreign governmental body in connection with the transactions contemplated by this Agreement.

4.6.    Public Announcements. The Parent and the Seller shall consult with each other before issuing or making any press release, public announcement or other disclosure, public with respect to this Agreement and shall not issue any such press release or make any such public statement or other public disclosure without the prior consent of the other party, which shall not be unreasonably withheld; *provided, however,* that a party may, without the prior consent of the other party, issue such press release or make such public statement as may upon the advice of counsel be required by any Law or the rules and regulations of the Nasdaq National Market System or the London Stock Exchange, if it has used reasonable efforts to consult with the other party prior thereto.

4.7.    Non-Competition; Non-Solicitation. Except for services provided by the Seller and its Affiliates pursuant to the existing joint projects listed on Subsection 1 of Schedule 4.7, for a period of one year after the Closing Date, with respect to any Person listed on Subsection 2 of Schedule 4.7, the Seller shall not, and shall cause its Affiliates not to, perform those services specified on Schedule 4.7; provided, however, that neither Seller nor its Affiliates shall be prohibited from providing those services to any person which Seller or its Affiliates other than the Transferred Companies provide or have previously provided. Subsection 2 of Schedule 4.7 lists all of the customers of the Transferred Companies, during the period commencing on January 1, 2000 and ending on the date hereof. For a period of one year after the Closing Date, the Seller shall not, and shall cause its Affiliates not to, either directly or indirectly as a stockholder, investor, partner, director, officer, employee or otherwise, solicit or attempt to induce any person employed by any Transferred Company as of the date hereof or as of the Closing Date to terminate his or her employment with the Parent, the Buyer or any Transferred Company.

4.8.    Business Records. Each of the Parent and Buyer acknowledges that the Seller may from time to time from and after the Closing require access to copies of certain of the Transferred Companies' books and records in connection with a legitimate business purpose and agrees that upon reasonable prior notice from the Seller, it will, and will ensure that the Transferred Companies will, during normal business hours, provide the Seller for ten (10) years after the Closing with either access to or copies of their books and records for such legitimate business purpose only; provided that Seller shall hold any information so received in confidence, other than information that (i) becomes available in the public domain other than as a result of a disclosure by Seller (or any director, officer, employee or advisor of Seller), (ii) is rightfully received by Seller from third parties without accompanying secrecy obligations, or (iii) is developed independently by Seller. Each of the Parent and the Buyer agrees that it will ensure that for ten (10) years after the Closing the Transferred Companies do not discard or destroy any

of their books and records prepared prior to the Closing Date except in the ordinary course of business and after reasonable notice to the Seller. In such circumstances, Seller shall have the right, at its expense, to remove and retain any of such books and records as Seller may select.

4.9.    Tax Matters.

(a)    Tax Returns. The Seller shall be responsible for preparing and filing the Tax Returns of, or which include, the Transferred Companies for taxable periods ending on or before the Closing Date and shall pay Taxes due thereon to the extent such Taxes exceed amounts accrued or reserved on the Financial Statements. Notwithstanding the foregoing, the Seller shall not be liable for any Taxes resulting from any action taken by the Parent, the Buyer or by a Transferred Company without the Seller's consent outside the ordinary course of business after the Closing.

The Parent and the Buyer shall be responsible for preparing and filing the Tax Returns of, or which include, the Transferred Companies for any taxable period that begins before and ends after the Closing Date and shall be responsible for the payment any Tax due thereon. The Seller shall have the right to review and comment on all such Tax Returns, which Tax Returns shall be prepared in a manner consistent with past practice. The Seller shall promptly reimburse the Buyer for the amount of Tax due with such Tax Returns attributable to the Transferred Companies for the period through the date of the Closing, to the extent such Taxes exceed amounts accrued or reserved on the Financial Statements. The Taxes attributable to the period through the Closing Date and to the period beginning on the following day shall be determined (i) as if those periods were separate taxable years, and (ii) except as otherwise required by law, by using the Tax accounting methods and Tax elections used by the Transferred Companies before the Closing Date.

The Parent and the Buyer shall be responsible for preparing and filing the Tax Returns of, or which include, the Company or any of its subsidiaries for all taxable periods beginning after the Closing Date and shall be responsible for the payment of all Taxes due thereon.

(b)    Tax Refunds. The Seller shall be entitled to all refunds of Tax of the Transferred Companies for periods through the Closing Date except for refunds attributable to carrybacks from periods ending after the Closing Date and required by law. If the Parent, the Buyer or any Transferred Company receives any refund to which the Seller is entitled, the Parent or the Buyer shall promptly pay (or cause the relevant Transferred Company to pay) the entire amount of such refund (including interest) to the Seller.

(c)    Cooperation and Control of Tax Disputes. Each of the Parent and the Buyer agrees to cooperate and to cause the Company and each of its subsidiaries to cooperate with the Seller to the extent reasonably required after the Closing Date in

connection with (i) the filing, amendment, preparation and execution of all Tax Returns with respect to any taxable period of the Company or any of its subsidiaries ending on or before the Closing Date, (ii) contests concerning Taxes due for any such period and (iii) audits and other proceedings conducted by Tax authorities with respect to any such period. Within a reasonable time (but not more than 15 days) after the Parent, the Buyer, the Company or any of its subsidiaries receives official notice of any such contest, audit or other proceeding, the Parent shall notify or cause the Company to notify the Seller in writing of such contest, audit or other proceeding. In any case where the Company or any of its subsidiaries is responsible under applicable law for the defense of such contest, audit or other proceeding, the Seller shall have the right to conduct the defense at its expense, whether such contest, audit or other proceeding commenced before or commences after the Closing; provided, however, that Parent shall have the right to approve (which approval shall not be unreasonably withheld) any such agreement or settlements to the extent they may affect taxes in periods following the Closing Date. Notwithstanding the Seller's obligations under the preceding provisions of this Section 4.9, the Seller shall have no obligation to pay or to indemnify or hold the Parent, the Buyer, the Company or any of its subsidiaries harmless from any tax imposed or assessed as a result of (i) the failure of the Parent, the Buyer or the Company to notify the Seller as required by this paragraph, if such failure adversely affects the Seller's ability to respond adequately in a timely manner to the notice of contest, audit or other proceeding, or (ii) any action taken by the Parent, the Buyer, the Company or any of its subsidiaries with respect to any such contest, audit or other proceeding without the Seller's written consent.

No loss, credit or other item of the Company or any of its subsidiaries may be carried back without the Seller's written consent, which the Seller may withhold in its reasonable discretion, to a taxable period for which the Seller or any subsidiary of the Seller filed a consolidated, unitary or combined Tax Return with the Company or any of its subsidiaries unless such carryback is required by law. The Seller shall promptly pay over to the Buyer the amount of any refund (including interest) received as a result of such a permitted carryback but may retain any refund (including interest) resulting from a carryback not so permitted.

The Seller agrees to cooperate with the Parent and the Buyer, and the Parent and the Buyer agree to cooperate (and cause the Company and each of its subsidiaries to cooperate) with the Seller, to the extent necessary in connection with the filing of any information return or similar document relating to the Buyer's acquisition of the Company.

(d)    Section 338(h)(10) Election. If requested by Buyer, the Buyer and the Seller shall join in an election under Section 338(h)(10) of the Code with respect to the Company. If such an election is made:

(i)     The Seller shall prepare and file the income Tax Returns for, be responsible for the payment of, indemnify and hold the Buyer and each corporation which is subject to the election harmless from, and be entitled to any refund of any federal and state income Taxes resulting from the election (and any corresponding election under state law).

(ii)    The Buyer shall initially determine the deemed sales price of the assets of the Company and its subsidiaries and the allocation of the deemed sales price among the assets of the Company and its subsidiaries for purposes of Section 338(h)(10) of the Code in accordance with all applicable Treasury Regulations promulgated under Section 338 of the Code. The Buyer shall submit such determination to Seller for Seller's review and approval.

(iii)   The Buyer and the Seller shall timely execute and file Form 8023 (or any successor form) and any documents that may be required under any applicable state law, rule or regulation for such election (or any corresponding election under state law, rule or regulation) to be effective for federal and state income tax purposes.

(iv)    If requested by Buyer or Seller, the parties shall cooperate in filing an election under Section 338(g) of the Code with respect to IndiaCo or any foreign subsidiary of the Company.

(v)     The Parent or the Buyer shall pay the Seller at Closing an amount agreed upon prior to Closing equal to 1.67 times the excess, if any, of (x) the aggregate federal and state income Taxes (net of any federal Tax benefit for state and local Taxes) to be incurred by the Seller as a result of the election over (y) the aggregate federal and state income tax (net of any federal tax benefit for state and local Taxes) that the Seller would have incurred if no Section 338(h)(10) election (or Section 338(g) election to the extent such election is made other than at Seller's request) had been made. In the event that it is later determined, by audit or otherwise, that the amount paid under the preceding sentence was insufficient to cover Seller's increased taxes, Parent or Buyer shall promptly pay Seller any additional amounts due.

(e)     <u>Transfer Taxes</u>. The Parent and the Buyer agree to pay any sales, use, transfer, stock transfer or withholding or like Taxes related to the transfer of the Shares and the deemed sale of assets resulting from any Section 338(h)(10) election.

(f)     <u>Dispute Resolution</u>. If the Seller and the Buyer do not agree as to any question which arises under this Section 4.9, either of them, after giving written notice to the other, may refer the question to KPMG for resolution. After giving each party an opportunity to present its position, KPMG shall within 45 days after such referral decide the question. The decision of KPMG shall be final and shall bind both parties. KPMG fees shall be borne equally by the Seller and the Buyer.

4.10.  Use of Names.  The Parent, the Buyer and the Company will not, and will cause their affiliates not to, use the trade names or marks "Renaissance" or "Renaissance Worldwide," or any trade names or marks that include, or are confusingly similar to, any such marks. Notwithstanding anything to the contrary in the preceding sentence, certain of the Transferred Companies, the corporate names of which currently contain the trade name or mark "Renaissance" or "Renaissance Worldwide" shall be permitted to use such corporate name at no cost for a period of 90 days after the Closing Date pursuant to the terms of a license agreement to be entered into by the Seller, the Company and IndiaCo substantially in the form attached hereto as "Exhibit B"; *provided, however,* that each such Transferred Company shall change its name to comply with the first sentence of this Section 4.10 within such 90-day period.

4.11.  License Agreement.  The Seller, the Company and IndiaCo, in connection with the transactions contemplated hereby, will enter into a license agreement for a term of five years from the Closing Date substantially in the form attached hereto as "Exhibit B", pursuant to which Seller will grant to the Transferred Companies a non-exclusive, royalty-free, worldwide license to use the trademark "concept to completion".

4.12.  Certain Actions.

(a)    The Parent and the Buyer and its Affiliates shall perform all obligations required to be performed by them in accordance with and pursuant to the Underwriting Agreement and shall not amend, terminate or waive any material provisions under such Underwriting Agreement without the Seller's consent (such consent not to be unreasonably withheld or delayed).  Parent shall contribute to Buyer from the proceeds of the offering contemplated by the Underwriting Agreement or otherwise amounts sufficient to permit the Buyer to satisfy its obligations under this Agreement.  Parent shall from time to time provide such information as Seller may reasonably request regarding the status of obtaining the approval of its shareholders described in Section 4.14.

(b)    Each of the Parent and the Buyer shall provide prompt written notice to the Seller following its receipt of notification by any party to the Underwriting Agreement of such party's refusal or intended refusal to fulfill its obligations under the Underwriting Agreement and the stated reasons therefor (if any).  Each of the Parent and the Buyer shall use reasonable best efforts (i) to enforce its rights under the Underwriting Agreement, (ii) to cause all conditions under the Underwriting Agreement, including, but not limited to, the Underwriting Conditions, to be satisfied, (iii) to cause all transactions contemplated by the Underwriting Agreement to be consummated, and (iv) to cause the conditions contained in Sections 6.8 and 6.9 of this Agreement to be satisfied.

4.13.  Benefit Plans.

(a)    Each of the Parent and the Buyer agrees to cause the Transferred Companies (i) to maintain for a period of one year after the Closing the Assumed Plans in effect on the date of this Agreement or with respect to which binding obligations were

entered into prior to the date of this Agreement, or (ii) to provide benefits (other than equity-based plans) to each current employee of the Transferred Companies that are not materially less favorable in the aggregate to such employees than those benefits in effect for such employees on the date of this Agreement, or (iii) in relation to each employee who is a member of or participant in a foreign plan, to provide benefits which are equal in value to the benefits attributable under applicable law to that employee under such foreign plan.

(b)     In addition to the agreement set forth in Section 4.13(a), from and after the Closing, the Transferred Companies shall honor in accordance with their respective terms (as in effect on the date of this Agreement), all of the Transferred Companies' employment, severance and termination agreements, plans and policies, including any change in control provisions contained therein.

(c)     With respect to any "employee benefit plan", as defined in Section 3(3) of ERISA, maintained by any Transferred Company (including any severance plan), for all purposes, including determining eligibility to participate and vesting, service with any such Transferred Company shall not be interrupted by, and shall continue after, the Closing; provided, however, that such service need not be recognized to the extent that such recognition would result in any duplication of benefits.

(d)     Buyer shall assume all COBRA responsibilities with respect to current and former Employees and their qualified beneficiaries, including but not limited to continuation coverage and required notices, with respect to all current and former Employees and their qualified beneficiaries who experience a qualifying event prior to the Closing Date.

(e)     On or prior to the Closing Date, Seller shall take all actions reasonably necessary and appropriate to become the sole sponsor of the Enterprise Solutions 401(k) Plan (the "401(k) Plan") and to remove any Transferred Company as a sponsoring employer of the 401(k) Plan; provided that Buyer shall take all actions reasonably necessary to assist Seller by providing records and other information to Seller as may be reasonably necessary for Seller to administer such 401(k) Plan, including without limitation, information necessary to complete any financial audit of the Plan, make distributions to Participants or former Participants, and make filings with governmental authorities.

(f)     Seller shall take all actions reasonably necessary to facilitate the spin-off of all flexible spending account balances from Seller's medical and dependent care reimbursement accounts with respect to employees of the Transferred Companies and shall provide such records as are reasonably required in connection therewith; provided that Buyer shall take all actions reasonably necessary to establish a plan to which such accounts shall be transferred.

4.14.   Shareholder Approval.  Parent shall use its reasonable best efforts to obtain as

8321720                                    -26-

promptly as practicable the consent of its shareholders necessary to consummate and make effective the transactions contemplated by this Agreement, and shall take all other actions reasonably necessary to consummate and make effective the transactions contemplated by this Agreement. Parent shall use its best efforts to dispatch to its shareholders no later than 6:00 p.m. (London time) on the date 2 days after the signing date a circular containing the unanimous recommendation of the directors of Buyer to vote in favor of the resolution containing the consent referred to in the previous sentence.

4.15.   Payment of Bonuses.  Buyer shall pay the "Deal Bonuses" listed in the chart on the first page of Section 2.9 of the Disclosure Schedule in accordance with the terms of such bonuses as described in the documents provided to Buyer by Seller.

4.16.   Resignations.  To the extent requested by Buyer in writing, Seller shall use commercially reasonable efforts to obtain and deliver to Parent the resignations, effective as of the Closing Date, of executive officers and directors and auditors of the Transferred Companies, in each case confirming that they have no claims against any of the Transferred Companies.

4.17.   Transfer of IndiaCo Shares.  In connection with the Closing, Seller shall take all actions necessary to cause HoldCo to transfer the IndiaCo Shares owned by HoldCo to Buyer.

4.18.   Dissolution of Renaissance Worldwide Strategy (S) Pte Ltd.  To the extent that Renaissance Worldwide Strategy (S) Pte Ltd. has not been dissolved prior to Closing, Parent and Buyer shall take all reasonable steps required to effect such dissolution in an expeditious manner after the Closing Date.

4.19.   Potential Counterclaim.  The Seller shall use commercially reasonable efforts to settle prior to Closing the potential claim of Marion Pepsi-Cola Bottling Co. described on Section 2.11 of the Disclosure Schedule. After Closing, Seller will retain sole control of any settlement negotiations, arbitration or litigation in connection with any claim or counterclaim by Marion Pepsi-Cola Bottling Co. against the Company which could reasonably be expected to result in Losses subject to indemnification by Seller pursuant to Section 8.2(a)(v) below.  In addition, Parent and Buyer agree that, at the request of Seller, they will cause personnel of the Transferred Companies to cooperate with Seller in connection with evaluating such claim and preparing for and pursuing such settlement negotiations, arbitration or litigation.

4.20.   Actions with respect to UK Leases.  Prior to Closing, the Seller will use commercially reasonable efforts to (a) cause Renaissance Worldwide Ltd. to enter into a sublease substantially in the form previously provided to Buyer with Renaissance Worldwide Strategy Ltd. with respect to a portion of the property at 33 Cavendish Square, 6th Floor, London, England W1M0RW;  (b) cause to be executed on or before September 28, 2000 an assignment of lease with respect to the property at 4 Great James Street, London, England WCI to Renaissance Worldwide Ltd., and a sublease thereof to Living Earth Foundation Ltd., both substantially in the form previously provided to Buyer; and (c) if the events described in the preceding clause (b) have not occurred on or prior to September 28, 2000, to cause to be executed the lease

8321720                                    -27-

assignment and the sublease with respect to the 4 Great James Street prior to Closing.

5.    CONDITIONS PRECEDENT TO THE OBLIGATIONS OF EACH PARTY. The respective obligations of each party to consummate the transactions contemplated hereby are subject to the satisfaction on or prior to the Closing Date of each of the following conditions:

    5.1.    HSR Act. The waiting period, if any, applicable to the consummation of the purchase and sale of the Shares under the HSR Act shall have expired or been terminated.

    5.2.    No Injunctions or Restraints; Illegality. No temporary restraining order, preliminary or permanent injunction or other order issued by any court of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the purchase and sale of the Shares shall be in effect, nor shall any proceeding brought by any administrative agency or commission or other governmental authority or instrumentality, domestic or foreign, seeking any of the foregoing be pending; and there shall not be any action taken, or any Law enacted, entered, enforced or deemed applicable to the purchase and sale of the Shares, which makes the consummation of the transactions contemplated herein illegal.

6.    ADDITIONAL CONDITIONS PRECEDENT TO THE OBLIGATIONS OF THE BUYER. The obligations of the Parent and the Buyer to purchase the Shares and to consummate the other transactions contemplated hereby is subject to the satisfaction on or prior to the Closing Date of each of the following conditions:

    6.1.    Representations and Warranties. The representations and warranties of the Seller contained in this Agreement shall be true and correct in all material respects as of the date hereof and as of the Closing Date as if made on and as of the Closing Date, except for (i) changes contemplated or permitted by this Agreement or the Disclosure Schedule and (ii) those representations and warranties which address matters only as of a particular date (which shall have been true and correct in all material respects as of such date), and the Parent and the Buyer shall have received a certificate to such effect signed on behalf of the Seller by an officer of the Seller.

    6.2.    Agreements and Covenants. The Seller shall have performed or complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by it at or prior to the Closing Date, and the Parent and the Buyer shall have received a certificate to such effect signed on behalf of the Seller by an officer of the Seller.

    6.3.    Consents Obtained. The consents, waivers, approvals, authorizations or orders specified in Exhibit C shall have been obtained.

    6.4.    Delivery of Shares. The Seller shall have delivered, or caused to be delivered, the Shares, free and clear of all Liens, to Buyer, accompanied by duly executed stock powers.

    6.5.    Shareholder Approval. A resolution to approve the sale and purchase of the

Shares provided for in the Agreement, if required, shall have been duly passed at an extraordinary general meeting of the shareholders of Parent.

6.6.    <u>Legal Opinion</u>.  The Seller shall have furnished to the Parent an opinion of Ropes & Gray, counsel to the Seller, as to (i) the due incorporation and legal existence of the Seller, (ii) the due authorization, execution and delivery of the Agreement, and (iii) the legal, valid and binding nature of the agreement (subject to customary qualifications).

6.7.    <u>Transition Services Agreement</u>.  Seller shall have entered into a Transition Services Agreement with attached statements of work  substantially in the form set forth in "<u>Exhibit E</u>" attached hereto and such shall be in full force and effect.

6.8.    <u>Underwriting Agreement</u>.  The conditions to closing contained in Sections 2.1.1 through 2.1.6 of the Underwriting Agreement (the "<u>Underwriting Conditions</u>") shall have been satisfied or waived; provided, however, that if the Parent does not notify the Seller in writing at or before 10:00 a.m. (London time) on Tuesday, September 26, 2000 that the Underwriting Conditions have not been met, the condition to closing contained in this Section 6.8 shall be deemed to be irrevocably waived by the Parent and Buyer.

6.9.    <u>Listing of Shares</u>. The new Ordinary Shares of Parent, arising on conversion of the Convertible Units of Loan Stock referred to in the Underwriting Agreement, shall have been admitted to the Official List of the United Kingdom Listing Authority and admitted to trading on the London Stock Exchange, such admission having become effective.

7.    ADDITIONAL CONDITIONS PRECEDENT TO OBLIGATIONS OF THE SELLER.  The obligations of the Seller to effect the sale of the Shares and to consummate the other transactions contemplated hereby is subject to the satisfaction on or prior to the Closing Date of each of the following conditions:

7.1.    <u>Representations and Warranties</u>.  The representations and warranties of Parent and Buyer contained in this Agreement shall be true and correct in all material respects as of the date hereof and as of the Closing Date as if made on and as of the Closing Date, and the Seller shall have received a certificate to such effect signed on behalf of Buyer by an officer of Buyer, and on behalf of Parent by an officer of Parent.

7.2.    <u>Agreements and Covenants</u>.  Each of Buyer and Parent shall have performed or complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by them on or prior to the Closing Date, and the Seller shall have received a certificate to such effect signed on behalf of Buyer by an officer of Buyer and on behalf of Parent by an officer of Parent.

7.3.    <u>Consents Obtained</u>.  The consents, waivers, approvals, authorizations or orders specified in <u>Exhibit C</u> shall have been obtained.

8321720                                               -29-

7.4.    Payment of Purchase Price.  The Buyer shall have delivered the Purchase Price to Seller.

7.5.    Legal Opinion.  The Buyer shall have furnished to the Sellers an opinion of Shaw Pittman, counsel to the Parent and the Buyer, as to (i) the due incorporation and legal existence of the Parent and the Buyer, (ii) the due authorization, execution and delivery of the Agreement, and (iii) the legal, valid and binding nature of the Agreement (subject to customary qualifications).

7.6.    Transition Services Agreement.  The Company and IndiaCo  shall have entered into a Transition Services Agreement with attached statements of work substantially in the form set forth in "Exhibit E" attached hereto and such shall be in full force and effect.

8.    INDEMNIFICATION.

8.1.    Survival of Representations and Warranties.  All of the representations and warranties contained herein or in any document, certificate or other instrument required to be delivered hereunder shall survive the Closing and continue in full force and effect until the applicable expiration date (the "Expiration Date"), as follows: the first anniversary of the Closing; provided, however, that the representations and warranties made in (i) Sections 2.3, 2.4, 2.5, 3.1 and 3.2 shall survive without time limit, and (ii) Sections 2.12, 2.16, 2.17, 2.20, 3.3 and 3.5 shall survive the Closing until the expiration of the applicable statute of limitations, and the term "Expiration Date" shall be deemed to mean whichever of the foregoing survival periods is applicable. The termination of any such representation and warranty, however, shall not affect any claim for any breach of any representation or warranty if written notice thereof is given to the breaching party or parties prior to such termination date.

8.2.    General Indemnity.  From and after the Closing, and subject to Section 8.3:

(a)    the Seller hereby agrees to indemnify, defend and hold harmless the Parent, the Buyer and its Affiliates and each of their respective directors and officers and each of their heirs and representatives (each, in its capacity as an indemnified party, an "Indemnified Party") against and in respect of all Losses after the Closing resulting from: (i) any breach of any representation or warranty made by the Seller herein or in any certificate delivered pursuant to this Agreement, (in the case of the representations and warranties set forth in Sections 2.6, 2.7, 2.10, 2.11, 2.15 and 2.23(c)  as if all such representations and warranties read with all qualifications and exceptions as to "Material Adverse Effect" deleted), (ii) any breach or non-performance by the Seller of any covenant, agreement or obligation to be performed by it hereunder; (iii) any liabilities arising under the Company Benefit Plans maintained, administered by or contributed to by any Transferred Company or Seller for the benefit of any employees, officers or directors of any Transferred Company as of the Closing Date, other than the Assumed Plans, which exceed in the aggregate $50,000, excluding those liabilities accrued on the

Financial Statements of the Company at the Closing or otherwise assumed by the Buyer under this Agreement; (iv) any liabilities arising in connection with Renaissance Worldwide Strategy (S) Pte Ltd. to the extent such liabilities do not arise out of the actions of Buyer and its Affiliates (including, with respect to actions taken after the Closing, the Transferred Companies), and (v) any claim or counterclaim brought by Marion Pepsi-Cola Bottling Co. against the Company alleging non-performance of the obligations of the Company prior to Closing or any other breach prior to Closing by the Company of its obligations under the Consulting Agreement between Marion Pepsi-Cola Bottling Co. and the Company dated May 6, 1999, or any litigation, arbitration or settlement thereof.

(b)     Each of the Parent and the Buyer hereby agrees to indemnify, defend and hold harmless the Seller and its Affiliates and each of their respective directors and officers and each of their heirs and representatives (each, in its capacity as an indemnified party, an "Indemnified Party") against and in respect of all Losses after the Closing resulting from: (i) any breach of any representation or warranty made by the Buyer or the Parent herein or in any certificate delivered pursuant to this Agreement, and (ii) any breach or non-performance by the Buyer or the Parent of any covenant, agreement or obligation to be performed by it hereunder; and

The applicable Indemnified Party shall provide prompt written notice for any claim made or proposed to be made for indemnification under this Section 8.2, whether or not arising out of a claim by a third party.

8.3.    <u>Limitations on Indemnity</u>.  Notwithstanding the foregoing, no claim may be made or suit instituted under this Section 8 with respect to any breach (or purported breach) of representation or warranty after the applicable Expiration Date, except for Reserved Claims. The term "Reserved Claims" shall mean all claims as to which the Indemnitee has given any indemnifying party reasonably specific written notice (in light of the facts then known) on or prior to the applicable Expiration Date.  No claim may be made by any party pursuant to this Section 8 with respect to any breach of representation and warranty unless (a) such Loss is in excess of $100,000 and (b) the aggregate amount of all Losses incurred by such party as a result of such breaches that would, but for the limitations contained in this sentence, be indemnifiable hereunder exceeds $1,250,000, in which case the indemnifying party's liability, if any, hereunder with respect to such claims shall only be for any amount of such aggregate indemnifiable Losses in excess of such $1,250,000 deductible amount. In addition, no party shall be liable to any Indemnified Party pursuant to this Section 8 for Losses of the types described in Sections 8.2(a)(i) or 8.2(b)(i) to the extent that the total liability for such indemnifying party hereunder for such breach of representation or warranty claims would exceed forty percent (40%) of the Purchase Price. The foregoing time and dollar limitations on indemnification shall not apply to any breach of any covenant contemplated by this Agreement to be performed after the Closing. Notwithstanding anything to the contrary contained in this Agreement, neither the Parent nor the Buyer shall be entitled to make any claim for indemnification under this Section 8 with respect to any matter to the extent that the Purchase Price has been adjusted to reflect such matter pursuant

to Section 4.2 (or not required to be adjusted pursuant to Section 4.2(f)), and the amount of any Losses or other amounts for which indemnification is provided under this Section 8 shall be calculated net of any specific accruals, reserves or provisions reflected in the Final Closing Working Capital.

8.4.    Third Party Claims.  Promptly after the receipt by any Indemnified Party of notice of the commencement of any action against such Indemnified Party by a third party, such Indemnified Party shall, if a claim with respect thereto is or may be made against any party pursuant to this Section 8, give such indemnifying party written notice thereof.  The failure to give such notice shall not relieve any indemnifying party from any obligation hereunder except where, and then solely to the extent that, such failure actually prejudices the rights of such indemnifying party. Such indemnifying party shall have the right to defend such claim, at such indemnifying party's expense and with counsel of its choice reasonably satisfactory to the Indemnified Party.  If the indemnifying party assumes the defense of such claim, the Indemnified Party agrees to cooperate in such defense.  So long as the indemnifying party is conducting the defense of such claim as provided in this Section 8.4, the Indemnified Party may retain separate co-counsel at its sole cost and expense and may participate in defense of such claim, and neither the Indemnified Party nor the indemnifying party will consent to the entry of any judgment or enter into any settlement with respect to such claim without the prior written consent of the other, which consent will not be unreasonably withheld.  In the event the indemnifying party does not or ceases to conduct the defense of such claim as so provided, (i) the Indemnified Party may defend against, and consent to the entry of any judgment or enter into any settlement with respect to, such claim in any manner it may reasonably deem to be appropriate, (ii) subject to the limitations set forth in Section 8.3, the indemnifying party will reimburse the Indemnified Party promptly and periodically for the costs of defending against such claim, including reasonable attorneys' fees and expenses against reasonably detailed invoices, and (iii) the indemnifying party will remain responsible for any Losses the Indemnified Party may suffer as a result of such claim to the full extent provided in this Section 8.

8.5.    Exclusive Remedy.  From and after Closing, indemnification pursuant to (and subject to the conditions of) this Section 8 shall, in the absence of fraud, be the sole and exclusive remedy of the parties  and their respective Affiliates with respect to any breach of this Agreement and each party hereby waives, to the fullest extent permitted under applicable law, and agrees not to assert after Closing any other claim or action in respect of any such breach.

9.    DEFINITIONS.  Certain capitalized terms are used in this Agreement with the specific meanings defined below in this Section 9.

"401(k) Plan" has the meaning set forth in Section 4.13(e).

"Adjustment" has the meaning set forth in Section 4.2(c).

"Affiliate" shall have the meaning set forth in Rule 12b-2 of the regulations promulgated under the Securities Exchange Act of 1934, as amended.

"**Agreement**" has the meaning set forth in the preamble.

"**Assumed Plans**" has the meaning set forth in Section 2.12(a).

"**Buyer**" has the meaning set forth in the preamble.

"**Charter**" means the articles of incorporation, articles of organization, memorandum and articles of association, certificate of incorporation, limited partnership agreement, limited liability company operating agreement, and by-laws (or equivalent charter or organizational documents) of any business entity, in each case as amended and in effect from time to time.

"**Closing**" has the meaning set forth in Section 1.3.

"**Closing Date**" has the meaning set forth in Section 1.3.

"**COBRA**" has the meaning set forth in Section 2.12(c).

"**Code**" means the Internal Revenue Code of 1986, as amended and the regulations issued thereunder.

"**Company**" has the meaning set forth in the preamble.

"**Company Benefit Plan**" means any plan, program, agreement, policy or arrangement, whether covering a single individual or group of individuals, and whether or not reduced to writing, that is maintained in the United States and is:  (a) an employee welfare benefit plan within the meaning of Section 3(1) of ERISA; (b) an employee pension benefit plan within the meaning of Section 3(2) of ERISA; (c) a stock bonus, stock purchase, stock option, restricted stock, stock appreciation right or similar equity-based plan; or (d) any other deferred-compensation, retirement, welfare-benefit, bonus, incentive or fringe benefit plan or arrangement, vacation, sick, holiday or other paid leave plan, life insurance or other death benefit plan, severance or other similar benefit plan.

"**Confidentiality Letter**" has the meaning set forth in Section 4.4.

"**Contract**" has the meaning set forth in Section 2.14.

"**Disclosure Schedule**" has the meaning set forth in Section 2.

"**Draft Calculation**" has the meaning set forth in Section 4.2(c).

"**Employees**" has the meaning set forth in Section 2.12(c).

"Environmental Laws" means all applicable federal, state, foreign or local laws or any regulation, code, plan, order, decree, judgment, notice or demand letter issued, entered, promulgated or approved thereunder relating to pollution or protection of the environment, including without limitation laws relating to emissions, discharges, releases or threatened releases of pollutants, contaminants, or hazardous or toxic materials or wastes or any other Hazardous Substance into ambient air, surface water, ground water, or land or otherwise relating to the manufacture, processing, distribution, use, presence, production, treatment, storage, disposal, transport or handling of pollutants, contaminants or hazardous or toxic materials or wastes by the Transferred Companies.

"Hunter Shares" has the meaning set forth in the recitals.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations issued thereunder.

"ERISA Affiliate" has the meaning set forth in Section 2.12(d).

"Exchange Act" has the meaning set forth in Section 2.6(b).

"Expiration Date" has the meaning set forth in Section 8.1.

"Final September Working Capital" has the meaning set forth in Section 4.2(g).

"Financial Statements" has the meaning set forth in Section 2.8.

"GAAP" has the meaning set forth in Section 2.8.

"HoldCo" has the meaning set forth in the recitals.

"HSR Act" has the meaning set forth in Section 2.6(b).

"IndiaCo" has the meaning set forth in the recitals.

"IndiaCo Shares" has the meaning set forth in the recitals.

"Indebtedness" means with respect to any Person, all obligations in respect of: (a) borrowed money; (b) indebtedness evidenced by notes, debentures or similar instruments; (c) capitalized lease obligations; (d) the deferred purchase price of assets, services or securities (other than accounts payable incurred in the ordinary course of business); (e) reimbursement obligations, with respect to letters of credit to the extent such letters of credit are drawn, and such drawn amounts have not been reimbursed; (f) dividends to the extent declared (and not rescinded) but not yet paid; and (g) interest, premium and penalties, if any, owing in respect of the items described in the foregoing clauses (a) through (f).

8321720

-34-

"**Indemnified Party**" has the meaning set forth in Section 8.2.

"**Independent Expert**" has the meaning set forth in Section 4.2(f).

"**Intellectual Property**" means: (a) all patents and patent applications, together with all reissuances, continuations, revisions and extensions thereof; (b) all registered trademarks, service marks, trade dress, logos, trade names, and corporate names, including without limitation all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith; (c) all copyrights and copyrightable works, and all applications, registrations, and renewals in connection therewith; and (d) all proprietary computer software (other than commercially available software generally available for license to companies engaged in businesses similar to the businesses of the Transferred Companies).

"**Intellectual Property Rights**" has the meaning set forth in Section 2.18(a).

"**IRS**" has the meaning set forth in Section 2.16(a).

"**Laws**" has the meaning set forth in Section 2.6(a).

"**Leases**" has the meaning set forth in Section 2.23(b).

"**Lien**" shall mean any mortgage, pledge, lien, security interest, attachment or encumbrance, <u>provided</u>, <u>however</u>, that the term "Lien" shall not include (i) statutory liens for Taxes to the extent the obligations secured thereby are not past due or are being disputed in good faith, (ii) encumbrances in the nature of zoning restrictions, easements, rights or restrictions of record on the use of real property if the same do not materially impair the use of such property, (iii) liens to secure landlords, lessors or renters under leases or rental agreements confined to the premises rented, (iv) deposits or pledges made in connection with, or to secure payment of, worker's compensation, unemployment insurance, old age pension programs mandated under applicable Laws or other social security, (v) liens in favor of carriers, warehousemen, mechanics and materialmen to the extent the obligations secured thereby are not past due or are being disputed in good faith, (vi) liens to secure claims for labor, materials or supplies and other like liens, to the extent the obligations secured thereby are not past due or are being disputed in good faith, and (vi) restrictions on transfer of securities imposed by applicable Laws.

"**Losses**" means any and all damages, deficiencies, awards, assessments, amounts paid in good faith settlement, liabilities, charges, decrees, rulings, fees, judgments, fines, penalties, costs and expenses (including without limitation reasonable attorneys' and expert witness' fees and expenses); <u>provided</u>, <u>however</u>, that the amount of any such Losses for the purposes of indemnification hereunder shall be determined net of the sum of any amounts reasonably recoverable by the Indemnitee under insurance policies with respect to such Loss and the present value (based on a discount factor equal to the applicable federal rate as determined under section 1274(d)(1) of the Code) of any Tax Benefit reasonably expected to be realized by the Indemnitee

(or any consolidated, combined or unitary group of which the Indemnitee is also a member) arising from the incurrence or payment of such loss.

"**Material Adverse Effect**" means any change, effect or circumstance that is materially adverse to the business, assets, financial condition or results of operations of the Transferred Companies, taken as a whole, or that materially and adversely affects the ability of the Seller to perform its obligations under this Agreement and consummate the transactions contemplated hereby; provided, however, that none of the following shall be deemed in themselves (either alone or in combination) to constitute, and none of the following shall be taken into account in determining whether there has been or will be, a Material Adverse Effect: (i) any change, effect or circumstance that arises by reason of or relates to a general deterioration in the economy or in the industries in which the Transferred Companies operate (whether in the United States or in the foreign countries in which the Transferred Companies operate), (ii) any change, effect or circumstance that arises out of or relates to the disclosure of the fact that the Parent or the Buyer is the prospective acquiror of the Transferred Companies, (iii) any change, effect or circumstance that arises out of or relates to action taken by the Parent or any of its Affiliates (iv) any change, effect or circumstance to the extent attributable to the announcement or pendency of the transactions contemplated hereby (including any cancellations of or delays in customer orders, any reduction in sales, any disruption in supplier, distributor, partner or similar relationships or any loss of employees); (v) any adverse change, effect, event, occurrence, state of facts or development arising from or relating to any change in accounting requirements or principles imposed upon the Transferred Companies or any change in applicable laws, rules or regulations or the interpretation thereof, or (vi) any adverse change, effect, event, occurrence, state of facts or development arising from or relating to compliance with the terms of, or the taking of any action required by, this Agreement.

"**Most Recent Balance Sheet**" has the meaning set forth in Section 2.8.

"**Non-Acceptance Notice**" has the meaning set forth in Section 4.2(e).

"**Parent**" has the meaning set forth in the preamble."

"**Parent Financial Statements**" has the meaning set forth in Section 3.7.

"**Person**" means any natural person or any corporation, association, partnership, joint venture, limited liability, joint stock or other company, trust, or governmental or other legal entity.

"**Policies**" has the meaning set forth in Section 4.2(c).

"**Purchase Price**" has the meaning set forth in Section 1.2.

"**PWC**" has the meaning set forth in Section 4.2(d).

"PWC Calculation" has the meaning set forth in Section 4.2(d).

"Renaissance Advance" has the meaning set forth in Section 4.2(a).

"Reserved Claims" has the meaning set forth in Section 8.3.

"Securities Act" means the Securities Act of 1933, as amended and the regulations issued thereunder.

"Seller" has the meaning set forth in the preamble.

"September Cash" has the meaning set forth in Section 4.2(c).

"September Cash Payment Date" has the meaning set forth in Section 4.2(c).

"September Working Capital" has the meaning set forth in Section 4.2(c).

"Shares" has the meaning set forth in the recitals.

"Tax" has the meaning set forth in Section 2.16(a).

"Tax Return" has the meaning set forth in Section 2.16(a).

"Transferred Company" means any and all of the Company, its subsidiaries and IndiaCo.

"Transferred Company Plan" has the meaning set forth in Section 2.12(a).

"Underwriting Agreement" has the meaning set forth in Section 3.4.

"Underwriting Conditions" has the meaning set forth in Section 6.8.

"Working Capital Deficit" has the meaning set forth in Section 4.2(g).

"Working Capital Surplus" has the meaning set forth in Section 4.2(g).

10.    MISCELLANEOUS.

10.1.    Knowledge.  References in this Agreement to "knowledge of the Seller" shall be deemed to mean the actual knowledge of executive officers of the Seller and the directors and executive officers of the Transferred Companies.

10.2.    Notices.  All notices, requests, demands, claims and other communications hereunder shall be in writing and shall be sent by facsimile, overnight courier, registered mail or

certified mail. Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given, as applicable, (a) upon confirmation of receipt of facsimile (provided that a second copy is also sent by U.S. mail or reputable overnights courier service), (b) one business day following the date sent when sent by overnight delivery through Federal Express, United Parcel Service or other reputable overnight courier service or (c) five business days following the date mailed when mailed by registered or certified U.S. mail return receipt requested and postage prepaid at the following address:

If to Seller, to it at:

> Renaissance Worldwide, Inc.
> 52 Second Avenue
> Waltham, MA
> Attn:  General Counsel
>
> Telephone:  781-290-3000
> Telecopier:  781-290-3913

With a copy to:

> Ropes & Gray
> One International Place
> Boston, MA 02110
> Attn:  Keith F. Higgins, Esq.
>
> Telephone: (617) 951-7000
> Telecopier: (617) 951-7050

If to the Buyer or the Parent, to it at:

> Cedar Group Plc
> Cedar House
> 78 Portsmouth Road
> Cobham
> Surrey KT11 1HY
> United Kingdom
>
> Telephone: 44 (0) 1932 584000
> Telecopier: 44 (0) 1932 584001

With a copy to:

> Biddle (Solicitors)
> 1 Gresham Street

8321720

78 Portsmouth Road
London EC2V 7BU
United Kingdom

Telephone: 44 (20) 7606 9301
Telecopier: 44 (20) 7606 3305

Notwithstanding the foregoing, any party may send any notice, request, demand, claim, or other communication hereunder to the intended recipient at the address set forth above using any other means (including personal delivery, expedited courier, messenger service, ordinary mail, or electronic mail); *provided, however,* that no such notice, request, demand, claim, or other communication shall be deemed to have been duly given unless and until it actually is received by the intended recipient. Any party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other party notice in the manner herein set forth.

10.3. <u>Expenses of Transaction</u>. Whether or not the transactions provided for herein are consummated, except as otherwise provided herein, each of the parties hereto will assume and bear all expenses, costs and fees (including legal and accounting fees and expenses) incurred by such party in connection with the preparation, negotiation and execution of this Agreement and the transactions contemplated hereby; *provided, that,* expenses of the Transferred Companies incurred prior to the Closing shall be deemed to be expenses of the Seller; *provided further, however,* notwithstanding the foregoing, (i) the Parent or the Buyer shall pay the fee payable to PricewaterhouseCoopers LLP for performing the audit of the Transferred Companies undertaken at Buyer's request in connection with the requirements of the London Stock Exchange; (ii) Buyer and Seller shall each pay $22,500, or one half, of the fee required to be paid to the Federal Trade Commission under the HSR Act in connection with the transactions contemplated by this Agreement and (iii) if the Closing occurs, the Parent or the Buyer will pay the Deal Bonuses described in Section 4.15 above.

10.4. <u>Assignment</u>. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the successors and permissible assigns of the Seller, the Parent and the Buyer. This Agreement and any rights hereunder shall not be assigned, hypothecated or otherwise transferred by any party hereto without the prior written consent of the other parties hereto; provided, however, that the Parent or the Buyer may assign this Agreement and any rights hereunder, following the Closing, to any Affiliate of the Parent provided that such assignment shall not relieve either the Parent or the Buyer, respectively, of any liability for the non-performance of its obligations hereunder.

10.5. <u>Entire Agreement</u>. The agreement of the parties that is comprised of this Agreement, the Exhibits and Schedules hereto and the other documents referred to herein sets forth the entire agreement and understanding between the parties and supersedes any prior agreement or understanding, whether oral or written, relating to the subject matter of this Agreement.

8321720

10.6.  No Further Representations, etc.  The Seller and the Transferred Companies have not made and are not making any representation, warranty, covenant or agreement, express or implied, with respect to the matters contained in this Agreement other than the explicit representations, warranties, covenants and agreements set forth herein.  The Seller hereby explicitly disclaims any and all representations or warranties other than those explicitly set forth in this Agreement.

10.7.  Headings.  The headings contained in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit, or describe the scope or intent of this Agreement.

10.8.  Termination.  The parties may terminate this Agreement as provided below:

(a)    the parties may terminate this Agreement by mutual written consent at any time prior to the Closing;

(b)    the Parent may terminate this Agreement by giving written notice to the Seller at any time prior to the Closing (or at such other time as is specified in this Section 10.8(b)) (i) in the event the Seller has breached any representation, warranty, or covenant contained in this Agreement in a manner that would cause a condition in Sections 6.1 or 6.2 not to be satisfied, the Parent has notified the Seller of the breach, and the breach cannot be cured within 15 days or the Seller fails to notify Parent within 10 days after such notice of its intent to cure such breach or (ii) if the Closing shall not have occurred on or before October 31, 2000 by reason of the failure of any condition precedent under Section 6.1 of this Agreement or (iii) at any time after 5:00 p.m. (Boston time) on Friday, October 6, 2000, if (x) pursuant to Section 6.8, the Parent provided a written notice to Seller at or before 10:00 a.m. London time on September 26, 2000 stating that the Underwriting Conditions had not been met or waived, (y) Seller did not exercise its right to terminate this Agreement pursuant to Section 10.8(c)(iv), and (z) Parent has not been able to cause the Underwriting Conditions to be satisfied, Parent shall have the right to terminate this Agreement at any time prior to 5:00 p.m. (London time) on October 13, 2000.

(c)    the Seller may terminate this Agreement by giving written notice to the Parent at any time prior to the Closing (or at such other time as is specified in this Section 10.8(c)) (i) in the event the Parent or the Buyer has breached any representation, warranty, or covenant contained in this Agreement in a manner that would cause the condition in Sections 7.1 or 7.2 not to be satisfied, the Seller has notified the Parent of the breach, and the breach cannot be cured within 15 days or the Parent fails to notify the Seller within 10 days after such notice of its intent to cure such breach or (ii) if any of the covenants specified in Section 4.12 is breached or is not complied with in any material respect or (iii) if the Closing shall not have occurred on or before October 31, 2000, by reason of the failure of any condition precedent under Section 7.1 of this Agreement or

(iv) if, pursuant to Section 6.8, the Seller receives from Parent a written not before 10:00 a.m. London time on September 26, 2000 stating that the Und Conditions have not been met or waived, the Seller shall have the right to te Agreement at any time prior to 5:00 p.m. (Boston time) on October 6, 2000;

(d)   any party may terminate this Agreement if the Closing has not occurred by November 15, 2000 unless the Closing has not occurred through the failure of the party seeking to terminate this Agreement or an Affiliate of such Person which is also party to this Agreement to comply fully with its obligations hereunder.

(e)   Time is and shall be of the essence in this Agreement.

10.9.   Effect of Termination.  If any party terminates this Agreement pursuant to Section 10.8 above, all rights and obligations of the parties hereunder shall terminate (other than the rights and obligations of the parties under Section 4.6 and 10.3) without any liability of any party to any other party (except for any liability of any party then in breach).

10.10.  Governing Law, etc.  This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts.  Each of the parties hereto hereby irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the courts of the Commonwealth of Massachusetts and of the United States of America located in the Commonwealth of Massachusetts for any actions, suits or proceedings arising out of or relating to this Agreement and the transactions contemplated hereby, and each of the parties hereto agrees not to commence any action, suit or proceeding relating hereto or thereto except in such courts.  Each of the parties hereto hereby irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby or thereby, in the courts of the Commonwealth of Massachusetts or the United States of America located in the Commonwealth of Massachusetts, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.  In any action or suit to enforce any right or remedy under this Agreement or to interpret any provision of this Agreement, the prevailing party shall be entitled to recover its costs, including reasonable attorneys' fees.

10.11.  Waiver of Jury Trial.  TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, EACH PARTY HEREBY WAIVES, AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING OUT OF OR PASSED UPON THIS AGREEMENT OR THE SUBJECT MATTER HEREOF, WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN TORT OR CONTRACT OR OTHERWISE.

10.12.  Counterparts.  This Agreement may be executed in any number of counterparts,

8321720                                    -41-

each of which shall be deemed an original for all purposes and all of which together shall constitute one and the same instrument.

10.13.  _Amendments and Waivers_.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by the Parent, the Buyer and the Seller.  No waiver by any party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

10.14.  _Severability_.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

10.15.  _No Third Party Beneficiaries_.  This Agreement shall not confer any rights or remedies upon any Person other than the parties hereto and their respective successors and permitted assigns.

10.16.  _Parent Guarantee_.

(a)    Parent hereby agrees to cause Buyer to perform in full all of its obligations (including, without limitation, its obligation to pay the amounts specified in Sections 1.2, 4.2 and, if applicable, 4.9 and its obligation to pay any amounts due pursuant to Section 8) pursuant to this Agreement.  The Parent hereby further unconditionally guarantees the full and punctual payment of all amounts payable by Buyer under this Agreement.  Upon failure by the Buyer to pay punctually any such amount, Parent shall forthwith on demand pay the amount not so paid.

(b)    The obligations of the Parent hereunder shall be unconditional and absolute and, without limiting the generality of the foregoing, shall not be released, discharged or otherwise affected by any change in the corporate existence, structure or ownership of the Buyer, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Buyer or its assets or any resulting release or discharge of any obligation of the Buyer contained in this Agreement.

(c)    The Parent irrevocably waives acceptance hereof, presentment, demand, protest and any notice not provided for herein, as well as any requirement that at any time any action be taken by any person or entity against the Buyer or any other person or entity.

**[The remainder of this page is intentionally left blank.]**

8321720

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed under seal by their respective duly authorized officers as of the day and year first written above.

CEDAR USA HOLDINGS, INC.

By:_____
    Name:
    Title:

CEDAR GROUP PLC

By:_____
    Name:
    Title:

RENAISSANCE WORLDWIDE, INC.

By:_____
    Name:    G. Drew Conway
    Title:    Chief Executive Officer

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed under seal by their respective duly authorized officers as of the day and year first written above.

CEDAR USA HOLDINGS, INC.

By: _Michael Hosie_

Name: M D HOSIE

Title: Director

CEDAR GROUP PLC

By: _Michael Hosie_

Name: M D HOSIE

Title: Director

RENAISSANCE WORLDWIDE, INC.

By: _____

Name:

Title: