## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

*********************************************

RENAISSANCE WORLDWIDE, INC.
       **Plaintiff**

VS.

CEDAR ENTERPRISE SOLUTIONS, INC.
f/k/a THE HUNTER GROUP, INC.
       **Defendant**

Civil Action No.
04-CV-11047PBS

*********************************************

CEDAR ENTERPRISE SOLUTIONS, INC.

and

CEDAR USA HOLDINGS, INC.
       **Counterclaim Plaintiffs**

VS.

RENAISSANCE WORLDWIDE, INC.
       **Counterclaim Defendant**

*********************************************

### AFFIDAVIT OF NUNZIO DOMILICI

I, Nunzio Domilici, on oath, hereby states as follows:

1.     I am the Chief Financial Officer for Aquent, which purchased the Plaintiff, Renaissance Worldwide, Inc. in December, 2001.

2.     The information contained in this Affidavit is based upon information and belief, and is submitted on behalf of Renaissance.

3. This Affidavit is submitted as a result of an Order of the Court on October 28, 2004, in order to respond, as I understand it, to the following questions asked by the Court:

   i. Does Renaissance have additional records to produce to Cedar in response to Cedar's Request for Production of Documents?

   ii. Why did Renaissance discard records pertaining to Cedar?

   iii. At the time records were discarded did Renaissance know it had a potential claim against Cedar?

   iv. At the time the records were discarded, did Renaissance intend to file suit against Cedar?

4. In order to address these questions, it is necessary for me to explain the background of Renaissance. Renaissance Worldwide Inc. (RWI) was a publicly traded company until 12/11/01. RWI had seen its financial performance decline dramatically beginning in 1998. Revenues dropped from $571 million in 1999 to approximately $300 million in 2001.

5. As part of an aggressive but ultimately unsuccessful growth strategy, RWI had acquired and then disposed of over 25 companies in the late 1990s and in 2000 and 2001. The Hunter Group was one of the entities – it was acquired by RWI and then sold to the Defendant.

6. On December 11, 2001, RWI merged with a subsidiary of Aquent LLC.

7. RWI was losing million of dollars annually at the time of the merger. RWI had a fiduciary responsibility to its shareholders to take immediate steps to mitigate these losses.

10/29/04 FRI 16:23 FAX 781 494 0208        COHN & DUSSI, LLC                    ☒005

8. RWI had in excess of $65 million in outstanding trade accounts receivable at the time of the merger, much of which was not current. RWI diligently prioritized and worked to collect as much of this amount as possible throughout 2002 and beyond.

9. Prior to the merger, RWI headquarters were located in Waltham, MA in a 202,000 sq. ft. facility. The annual rent paid by RWI on this facility was approximately $7 million and the least terminated on December 31, 2009.

10. On December 11, 2001, there were 116 individuals employed at RWI headquarters in Waltham. After the merger, we began prudent cost-cutting measures. By summer of 2002, only 23 of these individuals were still employed by RWI. At that time, all remaining RWI headquarters employees were transferred to Aquent headquarters in Boston, MA. Much historical knowledge and expertise was lost with the individuals that were no longer employed by RWI, including much information relevant to our dispute with Cedar. Our fiduciary responsibility to reduce losses at RWI took precedence over all other considerations.

11. At various dates throughout 2002, several equipment leases between RWI and various third party lessors were scheduled to expire. In order to satisfy its obligations under the leases RWI was required to either purchase the equipment at Fair Market Value or return the equipment to the lessors. In keeping with its efforts to reduce expenses, Renaissance returned as much equipment as possible. Standard procedure for returning leased computer equipment called for the hard

disks to be erased. Only the records that we could identify as pertinent to our core business were copied and retained.

12. Throughout 2002, RWI aggressively worked to mitigate the expense of the rent for the Waltham facility. In the fall of 2002, RWI reached agreement with its landlord to vacate 133,000 sq. ft. of space in the facility and turn the space over to the landlord - thus reducing its annual rent expense there by approximately $4.5 million. As part of this transaction, RWI was required to remove every item from the premises. At the time, many of the prior RWI employees that could have been helpful in sorting through the vast number of documents and helping us decide what to keep and what to discard had already been terminated and were unavailable. With a very short amount of time to perform this task, we identified what we thought were the documents that were relevant to our business and we disposed of the rest prior to vacating the Waltham facility.

13. As to the question of additional records, identified by Attorney Hecker on the Automatic Disclosures with a letter "N", which are alleged to have not been produced to Cedar, all records that we have uncovered pertinent to the original Claim against Cedar have been provided to Cedar, with the exception that those records pertinent to the claims against Cedar USA Holdings, Inc. and Cedar Group plc relating to the London lease were not produced to Cedar on September 30, 2004, because we were under the impression and the understanding that these records were not required to be disclosed until our Motion to Amend the Complaint to add claims against these parties had been approved by the Court. We were under the impression that once the Court allowed the Motion to Amend, we

would be called upon to produce the records relating to the London claim. Accordingly, we have made arrangements to deliver the records to Attorney Dustin Hecker, Cedar's counsel by the close of business today, as required by the Court.

14. We also believe that we have previously provided to Cedar copies of all the other documents identified by Attorney Hecker by the letter "N" on the Automatic Disclosures, including item numbers 14 and 15 in Section B of the Automatic Disclosures (although the check is not accurately a "cancelled" check), items 5 and 6 listed among the "New York City Documents" and item numbers 3 and 4 listed among the "Atlanta Documents". However, we will again provide copies to Attorney Hecker by the close of business today. In addition, item number 4 to Section B of the Automatic Disclosures is nothing more than the "Accounting" supplied as an Exhibit to the Complaint.

15. The invoices identified as Items 10 and 11 from Section B of the Automatic Disclosures are not in Renaissance's possession. The reason, however, that they were listed in the Automatic Disclosures is that when we provided information to our counsel to prepare the Automatic Disclosures, we were under the impression that we had to identify people or records or other evidence that we MAY use in this case, whether or not we had them in our possession. As a result of mis-communication with our Collection Agent (or Attorney), we viewed the Automatic Disclosures as a laundry list of documents we may be able to locate rather than a list of documents (and people) that we had in our possession at that

time. Renaissance was not aware that it must produce every document which it listed on the Disclosures, let alone produce it by the September 30, 2004.

16. As to the matter of why Renaissance discarded its records, Renaissance discarded records because we were required to vacate the former RWI headquarters as part of the real estate transaction referenced above. At the time, we retained very few employees that had personal knowledge of the vast number of paper and electronic files housed in the former RWI headquarters. We made our best efforts to identify and cull from those records the items that would be necessary in our continuing operation of the business. Much of the information was not able to be identified or catalogued by the remaining employees and was discarded.

17. Renaissance's records were discarded in the fall of 2002. During 2002, Renaissance and Cedar had been in discussion on past due obligations and current (at the time) obligations. Cedar had made some substantial payments in 2002 as those discussions were ongoing. At the time records were discarded, there were amounts outstanding from Cedar to Renaissance, but there appeared to be good faith efforts on the part of Cedar to resolve the amounts due.

18. At the time records were discarded, Renaissance believed at the time that Cedar would pay their outstanding obligations. Therefore, Renaissance had no intention of filing a law suit when its records pertaining to Cedar were destroyed.

19. We feel it is appropriate to re-emphasize some important fact related to this our dispute with Cedar. The amounts owed to Renaissance by Cedar are contractual obligations outlined in the Transition Services Agreement between RWI and Cedar. These are essentially pass-through expenses, paid from Cedar to RWI to

10/29/04 FRI 16:24 FAX 781 494 0208   COHN & DUSSI, LLC                    ☒009
10/29/04 16:24 FAX                    AQUENT
10/29/04 FRI 16:16 FAX 781 494 0208   COHN & DUSSI, LLC                    ☒003

compensate RWI for amounts paid to landlords, equipment lessors, etc. Cedar has defaulted on its obligations to RWI. Notwithstanding this default, RWI has made every payment obligation to its landlords and equipment lessors. RWI did not default on its obligations, even though Cedar has refused to pay its agreed-upon share. We very rarely find ourselves in a position in which we are forced to sue a party in order to enforce payment of an obligation. It is an expensive, time-consuming, and distracting process.

20. Any failure to produce the London records were made under a mistaken understanding, and all other records have been produced.

_____
Nunzio Domilici